**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION**

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA; AMERICAN HOTEL AND LODGING ASSOCIATION; ASSOCIATED BUILDERS AND CONTRACTORS; ASSOCIATED GENERAL CONTRACTORS OF AMERICA; COALITION FOR DEMOCRATIC WORKPLACE; INTERNATIONAL FRANCHISE ASSOCIATION; LONGVIEW CHAMBER OF COMMERCE; NATIONAL ASSOCIATION OF CONVENIENCE STORES; NATIONAL RETAIL FEDERATION; RESTAURANT LAW CENTER; TEXAS ASSOCIATION OF BUSINESS; and TEXAS RESTAURANT ASSOCIATION, | Civil Action No. |
| Plaintiffs, | |
| v. | |
| NATIONAL LABOR RELATIONS BOARD; LAUREN MCFERRAN, Chair; MARVIN KAPLAN, Board Member; GWYNNE WILCOX, Board Member; and DAVID PROUTY, Board Member, | |
| Defendants. | |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiffs Chamber of Commerce of the United States of America, American Hotel and

Lodging Association, Associated Builders and Contractors, Associated General Contractors of

America, Coalition for a Democratic Workplace, International Franchise Association, Longview

Chamber of Commerce, National Association of Convenience Stores, National Retail Federation,

Restaurant Law Center, Texas Association of Business, and Texas Restaurant Association allege and state as follows:

## INTRODUCTION

1.     On October 27, 2023, the National Labor Relations Board, over a strong dissent, promulgated a new rule titled Standard for Determining Joint Employer Status, 88 Fed. Reg. 73,946, codified at 29 C.F.R. § 103.40 ("Joint Employer Rule").

2.     The Rule is as destabilizing as it is unlawful.  It displaces widely accepted common-law standards governing the scope of employment relationships, establishes entirely new tests of employer liability, reconfigures relationships among legally separate entities, erases distinctions between contractors and employers, and threatens billions of dollars in liability and costs.

3.     These sweeping changes were not made in response to any new law, judicial decision, or factual circumstances.  Instead, the Board rammed them through because—it says— the 90-year-old National Labor Relations Act ("NLRA") has been misinterpreted for most of its existence.  The Board's newfound interpretation, moreover, conveniently "requires" reversal of a rule the Board promulgated just three years ago.

4.     The Board's decision to repeal and replace its previous rule suffers from three crucial errors.  First, the Board's interpretation of who is a "joint employer" under the NLRA is overbroad and directly contradicts the established common-law definition that limits joint employment to relationships of actual and substantial control.  The new Rule imposes joint-and-several liability on virtually every entity that hires contractors subject to routine parameters, defines the terms of those contracts, or collaborates with a third party of any kind in

achieving common goals that have an incidental or indirect effect on the third party's employees. Nothing in the NLRA or common law compels the Board's approach.

5.    Second, the Board abandons one of the most important limiting principles in the NLRA: to be an employer, let alone a joint employer, one must possess sufficient control over workers' essential terms and conditions of employment to permit meaningful collective bargaining. The new Rule includes no such limit.

6.    Third, the Rule replaces a clear standard, under which employers have tailored their business arrangements, with an arbitrary and uncertain standard that threatens chaos and indeterminacy in national labor relations across major industry sectors.

7.    Plaintiffs and their members do not oppose regulations that require employers to meet their collective-bargaining obligations under the NLRA.  In fact, Plaintiffs have long supported the development of a clear joint-employment standard.  But the Board's new Rule jettisons the common-law boundaries that define the NLRA and harms the workers, labor unions, and employers the Board purports to protect.

8.    In short: the Joint Employer Rule transgresses the NLRA and is otherwise unlawful under the Administrative Procedure Act ("APA").  So too is the Board's rescission of its previous rule on the flawed premise that it is contrary to common-law principles.  The Court should vacate the Board's rescission of the previous rule and its promulgation of the new Joint Employer Rule, and enjoin the Board from enforcing its new Rule.

## JURISDICTION AND VENUE

9.    The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) and 5 U.S.C. §§ 701-706 (APA).

10.     The Court has the authority to grant the requested declaratory and injunctive relief under the APA, 5 U.S.C. §§ 702, 705-706, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202.

11.     Plaintiffs have associational standing to bring this suit on behalf of their various members.  To begin, Plaintiffs' members are directly and adversely affected by the Board's Joint Employer Rule and thus have standing to sue in their own right.  Specifically, Plaintiffs' member-employers participate in business arrangements such as franchising and contracting that are more likely to expose them to joint-employer liability under the Rule.  Those employer members face a greater risk of union campaigns, enforcement actions, and litigation relating to collective bargaining.  Those employers will also experience substantial compliance costs as they modify their business and other practices to account for those risks.

12.     The Rule also conflicts with each Plaintiff's policy objectives, and challenging the Rule is germane to each Plaintiff's purpose.  Neither the claims asserted nor the relief requested requires Plaintiffs' individual members to participate in the suit.

13.     Venue is proper in this district under 28 U.S.C. § 1391(e)(1).  Plaintiff Longview Chamber of Commerce is located in Longview, Texas, and several other Plaintiffs have members located in the Eastern District of Texas.

**PARTIES**

14.     Plaintiff Chamber of Commerce of the United States of America ("U.S. Chamber") is the world's largest business federation, with approximately 300,000 members, including members in the Eastern District of Texas.  Among other things, the U.S. Chamber represents the interests of its member-employers in employment and labor-relations matters—including matters arising under the NLRA—as part of its overall mission to advocate for policies designed to help

businesses create jobs and grow the national economy.  In advancing its mission, the Chamber seeks to preserve the ability of its members to enter into contracting relationships, joint ventures, or franchise agreements, and to acquire subsidiaries or interests in other businesses, without incurring liability for workplace issues that the Chamber's members do not actually control.

15.    Plaintiff American Hotel and Lodging Association ("AHLA") is the national association representing all sectors and stakeholders in the U.S. lodging industry, including owners, REITs, chains, franchisees, management companies, independent properties, suppliers, and state associations.  AHLA strives to be an indispensable resource serving, supporting, and advocating on behalf of the American hospitality industry to build a vibrant and united hospitality industry that powers America's economy.  For decades, AHLA has been following the Board's activity and keeping members informed about relevant policy changes.

16.    Plaintiff Associated Builders and Contractors ("ABC") is a national construction industry trade association representing more than 22,000 members.  Founded on the merit shop philosophy, ABC and its 68 chapters help members develop people, win work, and deliver that work safely, ethically, and profitably for the betterment of the communities in which ABC and its members operate. ABC's membership represents all specialties within the U.S. construction industry and primarily comprises firms that perform work in the industrial and commercial sectors. As set forth in ABC's bylaws, ABC's mission is to protect and promote free and open competition in the construction industry.  This mission includes protecting ABC's member contractors from harmful labor regulations such as the new Joint Employer Rule.

17.    Plaintiff Associated General Contractors of America ("AGC") is the nation's largest and most diverse trade association in the commercial construction industry, now representing more than 27,000 member companies, including over 6,800 general contractors, 9,100 specialty

contractors, and 11,600 service providers and suppliers to the industry through a nationwide network of chapters in all 50 states (including 11 chapters in Texas), the District of Columbia, and Puerto Rico.  AGC represents both union- and open-shop employers engaged in building, heavy, civil, industrial, utility, and other construction for both public and private property owners and developers.  AGC's mission is to serve our nation's construction professionals, and therefore the public interest, by promoting the skill, integrity, and responsibility of those who build America.

18.    Plaintiff Coalition for Democratic Workplace ("CDW") represents hundreds of employer associations, individual employers, and other organizations that together represent millions of businesses of all sizes.  CDW's members employ tens of millions of workers across the country in nearly every industry.  Its purpose is to combat regulatory overreach by the Board that threatens the wellbeing of employers, employees, and the national economy.

19.    Plaintiff International Franchise Association ("IFA") is the world's oldest and largest organization representing franchising worldwide.  IFA represents all aspects of the franchise business model, with approximately 1,200 franchise brands and 10,000 franchise business owners in addition to approximately 600 industry suppliers who support the franchise sector.  For over 60 years, IFA has worked through its government relations, public policy, media relations, and educational programs to advocate for the protection, promotion, and enhancement of franchising and the approximately 790,000 franchise establishments that support nearly 8.4 million direct jobs, $825.4 billion of economic output for the U.S. economy, and almost three percent of the gross domestic product.  IFA members include franchise companies in over 300 different industries, individual franchisees, and companies that support franchising in marketing, technology solutions, development, operations, and more.  As set forth in IFA's bylaws, IFA's

mission is to protect, promote, and enhance franchising.  This mission includes protecting the franchise sector from harmful labor regulations such as new Rule at issue here.

20.     Plaintiff Longview Chamber of Commerce is the leading advocacy organization in Gregg County, Texas representing the interests of business.  Its members include over 1,000 businesses and professional organizations in Gregg County and 11 adjacent counties (the "Longview Trade Area").  Its mission is to engage in and promote projects that have a positive economic impact on the Longview Trade Area, serving its members and their 50,000+ employees.

21.     Plaintiff National Association of Convenience Stores ("NACS") is an international trade association representing the convenience store industry with more than 1,500 retail and 1,600 supplier companies as members, the majority of which are based in the United States.  NACS advocates for the interests of the industry on a regular basis before the executive, legislative and judicial branches of government.  NACS regularly comments on labor laws and regulations including by submitting comments to the NLRB, the Department of Labor, and Congressional committees with jurisdiction over labor policy.

22.     Plaintiff National Retail Federation ("NRF") is the world's largest retail trade association—representing discount and department stores, home goods and specialty stores, Main Street merchants, grocers, wholesalers, chain restaurants, and Internet retailers from the United States and more than 45 countries.  For over a century, NRF has been a voice for every retailer and every retail job, educating, inspiring, and communicating the powerful impact retail has on local communities and global economies.

23.     Plaintiff the Restaurant Law Center ("RLC") is a public policy organization affiliated with the National Restaurant Association, the largest foodservice trade association in the world. The RLC routinely advocates on matters of labor-relations policy and represents the

interests of its members in labor and workforce matters before courts and regulatory agencies.  It is the only independent foodservice membership organization created specifically for this purpose. RLC members include corporate-owned foodservice establishments, franchisees, and independent operators.

24.    Plaintiff Texas Association of Business ("TAB") is the state chamber of commerce for Texas and the largest general business association in the state.  TAB represents member companies—large and small—to create a policy, legal, and regulatory environment that allows them to thrive in business.

25.    Plaintiff Texas Restaurant Association ("TRA") is a non-profit organization that regularly advocates for and educates its members on legal issues, legislation, labor and employment law, and other issues relating to the regulation of the restaurant industry.  The TRA is the leading business association for Texas's restaurant and foodservice industry, which spans over 55,000 locations throughout the state, employing a workforce of over 1.4 million—roughly 12% of the state's employment.  The TRA represents a diverse group of businesses, operators, employees, suppliers, educators, and students across the state, including members in the Eastern District of Texas.  TRA members include single-location family-run restaurants, multinational franchise operations, and every iteration between.

26.    Defendant NLRB is an independent federal agency in the Executive Branch and is subject to the APA.  The Board is headquartered in Washington, D.C.

27.    Defendant Lauren McFerran is the Chairman of the Board.  Chairman McFerran is sued in her official capacity.

28.    Defendant Marvin Kaplan is a Member of the Board.  Member Kaplan is sued in his official capacity.

29.     Defendant Gwynne Wilcox is a Member of the Board.  Member Wilcox is sued in her official capacity.

30.     Defendant David Prouty is a Member of the Board.  Member Prouty is sued in his official capacity.

## BACKGROUND

31.     Congress enacted the NLRA in 1935 to promote stable collective-bargaining relationships.  29 U.S.C. §§ 151 *et seq.*  To that end, the Act gives employees the right to unionize, prohibits employers and labor unions from violating workers' right to free association, and imposes obligations on employers to bargain collectively with employee representatives.

32.     When the NLRA applies, failing to bargain can expose an employer to suits for injunctive relief and monetary penalties.  And failing to comply with collective-bargaining agreements can expose an employer to suits as well.

33.     Sometimes two entities can be considered an employer, or "joint employer," of particular employees—making each employer obligated to bargain collectively with those employees.  But the NLRA does not define the term "joint employer."  The Act instead requires the Board and courts to determine the existence of such a relationship by reference to the common law.  *See NLRB v. Town & Country Elec., Inc.*, 516 U.S. 85, 94-95 (1995) (noting definition of "employer" under NLRA is governed by "common-law agency principles").

34.     For decades, the Board drew from the common law a straightforward framework: firms were "joint employers" if they exercised "direct," "immediate," and "substantial" control over the same employees' essential terms of employment.  The Board also ensured that putative joint employers had enough control over employees' essential terms and conditions of employment to permit meaningful collective bargaining.

35.     But in 2015, the Board abruptly changed the test.  The Board decided through adjudication that "compelling policy reasons" warranted a different approach.  *Browning-Ferris Indus. of Cal., Inc.*, 362 NLRB 1599, 1600, 1612 (2015).  The Board thus announced a new framework, allowing a "joint employer" finding whenever a firm exercised "indirect" control over the terms of employment for another firm's employees, or even just a "reserved right" to control the same.

36.     The D.C. Circuit held the Board "overshot the common-law mark" and thus reversed in part, holding that the Board (i) "provided no blueprint for what counts as 'indirect' control," (ii) "failed to differentiate between those aspects of indirect control relevant to status as an employer, and those quotidian aspects of common-law third-party contract relationships," and (iii) "never delineated what terms and conditions" of employment the two firms needed to control to make collective bargaining "meaningful."  *Browning-Ferris Indus. of Cal., Inc. v. NLRB*, 911 F.3d 1195, 1216, 1220-1222 (D.C. Cir. 2018).  Although the court found that indirect and reserved control could be relevant to determining joint employer status, it declined to decide whether indirect or reserved control alone would be sufficient to establish such status.

37.     In response to the D.C. Circuit's decision, the Board promulgated a new rule that addressed the court's admonitions and largely reinstated the longstanding joint-employer standard.  *See* Joint Employer Status Under the National Labor Relations Act, 85 Fed. Reg. 11,184 (Feb. 26, 2020), codified at 29 C.F.R. § 103.40 ("2020 Rule").

38.     The 2020 Rule provided that an entity is "a joint employer of a separate employer's employees only if the two employers share or codetermine the employees' essential terms and conditions of employment."  29 C.F.R. § 103.40(a).  And it included an exhaustive list of discrete "[e]ssential terms and conditions of employment" drawn from the common law—namely, wages,

benefits, hours of work, hiring, discharge, discipline, supervision, and direction.  *Id.* § 103.40(b).
Under this standard, "[e]vidence of the entity's indirect control over essential terms and conditions
of employment" was "probative," but not dispositive.  *Id.* § 103.40(a).  Rather, to "establish" joint
employer status, the 2020 Rule required that "the entity must possess and exercise such substantial
direct and immediate control" with "a regular or continuous consequential effect on an essential
term or condition of employment" so as to permit "meaningful[]" collective bargaining.  *Id.*
§ 103.40(a), (d).

39.     But the rule did not last long.  In 2022, a newly constituted Board proposed to
rescind and replace the 2020 Rule.  In October 2023, the Board did just that when it promulgated
the new Joint Employer Rule and vacated the 2020 Rule.  *See* Standard for Determining Joint
Employer Status, 88 Fed. Reg. 73,946, codified at 29 C.F.R. § 103.40.  And the Board did so on
the premise that the NLRA and common law *required* the Board to reverse course.

40.     As relevant here, the Board's new Rule provides that firms are "joint employers" if
they "possess the authority to control (whether directly, indirectly, or both)" or "exercise the power
to control (whether directly, indirectly, or both), one or more of the employees' essential terms and
conditions of employment."  The upshot is that reserved or indirect control over a single essential
term of employment, even if never exercised, suffices to make a firm an "employer" of another
firm's employees.

41.     The Rule also discards the former limiting principle that, to establish joint employer
status, it is necessary to show that "the putative joint employer possesses sufficient control over
employees' essential terms and conditions of employment to permit meaningful collective
bargaining."  *Browning Ferris*, 362 NLRB at 1600.

42.     The Rule is set to go into effect on December 26, 2023.  But given the sea change it brings about, affected entities already feel the Rule's effects.  Indeed, as explained further below, many face business-altering decisions.

## CLAIMS FOR RELIEF

43.     The APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."  5 U.S.C. § 702.

44.     The APA further provides that "final agency action for which there is no other adequate remedy in a court" is "subject to judicial review."  5 U.S.C. § 704.

45.     Under the APA, courts "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "unsupported by substantial evidence."  5 U.S.C. § 706(2)(A), (C), (E).

46.     The Board's rescission of the 2020 Rule and its promulgation of the Joint Employer Rule are "final agency action" within the meaning of the APA.

## COUNT I —AGENCY ACTION CONTRARY TO LAW
## AGAINST ALL DEFENDANTS

47.     Plaintiffs re-allege and incorporate by reference each of the preceding paragraphs and allegations.

48.     Under the longstanding common-law principles incorporated into the NLRA, a joint-employer relationship has two main requirements: (1) the joint employer must exert direct, immediate, and substantial control over the employees' essential terms and conditions of

employment, and (2) the joint employer's control is different from, and more substantial than, the control a firm has over a common-law independent contractor.

49.     The Board's new Joint Employer Rule rides roughshod over both.

50.     First, the Rule *mandates* a "joint employer" finding whenever a firm has the mere "authority" to control a single essential term of employment, even if never exercised.  The Rule also explicitly makes "indirect" control alone sufficient.  And the Rule allows a firm to be declared a "joint employer" even when the control available to that firm is de minimis, sporadic, or isolated.  Yet none of those principles is permitted, let alone required, by the common-law precedent that defines the NLRA's terms.  *See Adams & Assocs., Inc. v. NLRB*, 871 F.3d 358, 378 (5th Cir. 2017) (unexercised, reserved control was "insufficient to establish a joint-employer finding, absent evidence that the right was ever exercised").

51.     Second, the Rule obscures the formerly clear dividing line between employees, on the one hand, and independent contractors, on the other.  The Rule permits standards formerly used to determine whether a worker is an independent contractor or an employee (i.e., whether a worker has an employer at all) to determine joint employer status (i.e., whether a worker has a *second* employer in addition to her indisputable employer).  In particular, by permitting indirect and reserved control alone to qualify a firm as a joint employer, and by offering a list of capacious and vague categories (such as "work rules and directions" and "safety and health") to define the relevant aspects of a joint employer's "control," the rule fails to differentiate the truly "essential" terms and conditions of employment from the "quotidian aspects of common-law third-party contract relationships."  *Browning-Ferris*, 911 F.3d at 1220.

52.     The Rule is unlawful for yet another reason: the structure and purpose of the NLRA require an employer to possess enough control over employees' essential terms and conditions of

employment such that collective bargaining between the two is "meaningful."  Yet the Rule abandons that condition.  It does not require putative joint employers to have control over all or even most of the employees' traditional mandatory subjects of bargaining; control over just one is enough.  And even then, the Rule renders irrelevant the extent of control necessary to make informed decisions and tradeoffs at the bargaining table.

53.     In addition, the Board's decision to rescind the 2020 Rule on the premise that the rule is *inconsistent* with longstanding common-law principles is contrary to law because the 2020 Rule is *consistent* with those principles.

54.     Thus, the Board's rescission of the 2020 Rule and its promulgation of the new Joint Employer Rule are contrary to law.

## COUNT II —ARBITRARY AND CAPRICIOUS AGENCY ACTION
## AGAINST ALL DEFENDANTS

55.     Plaintiffs re-allege and incorporate by reference each of the preceding paragraphs and allegations.

56.     The APA "requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). "[R]easonable regulation ordinarily requires paying attention to the advantages *and* the disadvantages of agency decisions." *Michigan v. EPA*, 576 U.S. 743, 753 (2015).

57.     The Board's sudden about-face here—vacating a vastly different rule the Board promulgated just three years ago—fails that test.  To start, the Board ignored the many practical problems and real-world disruption created by the Joint Employer Rule, claiming relevant comments were "misdirected"—and that its hands were tied—given its newfound interpretation

of the NLRA.  But the Board was wrong to conclude that the NLRA *compelled* this reversal, and the problems it ignored are significant.

58.     Take the Rule's effects on some major industries as examples:

a.     *Restaurants*.  A significant portion of the restaurant industry operates on the franchise model.  Under that model, franchisees retain direct and immediate control of the day-to-day operation of their businesses and employees (such as who to hire or fire, business hours, setting wages and schedules), while franchisors set standards to maintain brand uniformity and consistency (such as how workers dress and how food is prepared).  But the Rule makes no effort to distinguish these normal (and, as discussed further below, sometimes required) contractual controls from those indicative of joint employment.  As the dissent recognized, the result is "significant risk that many franchisors will be held liable as joint employers of their franchisees' employees."  88 Fed. Reg. at 74,001 (Kaplan, M., dissenting).  This will likely lead to one of two responses: either franchisors "will exert much greater control over their franchisees, effectively turning previously independent owners of franchisees into glorified managers;" or franchisors "will distance their franchisees by denying them guidance" previously given, "forcing franchisees to incur the expense of obtaining that guidance" elsewhere.  *Id.*  Indeed, Plaintiffs' members have reported that the new Rule already has created massive uncertainty and a dramatic rise in operational risk-management costs at many franchise restaurants.

b.     *Construction*.  Given the nature of construction, there are usually multiple entities operating on any given project.  "Each of these parties typically remains the sole employer of its own employees.  But a general contractor must exert a degree of control over subcontractors and their employees to ensure that work on a given project meets efficiency, quality, and safety benchmarks."  88 Fed. Reg. at 74,001 (Kaplan, M., dissenting).  In fact, many general contractors

must sign standard-form agreements, obligating them "to reserve and exercise some level of control over their subcontractors' employees." *Id.* Under the Board's new Rule, such forms could make general contractors a "joint employer" for every employee working on the project.  The general contractors could then be subject to any enforcement actions under the NLRA against a subcontractor, be pulled into labor disputes without the protections from secondary boycotts normally accorded to neutral third parties, or be forced to respond to the union-organizing campaigns of any subcontractor's employees.  In sum, the Rule will disrupt long-established operational methods by which construction service providers work together to build America, and will clearly have a harmful effect on both small and large businesses in the construction industry—many of which are members of the construction-industry Plaintiff associations.

    c. *Retail*.  Like members of the restaurant industry, members of the retail industry often operate on a franchise model and will thus suffer the harms described above.  But retailers also have reason to worry that normal contract relationships will create joint-employer liability where there was none before.  Retailers regularly contract with other companies for a wide range of services, such as janitorial support, lawn care, health and safety inspections, and temporary work.  When they do, retailers often give the other companies' employees directions on health and safety procedures.  Retailers also might implement formal training and impose conduct requirements so the other companies' public-facing employees behave in a manner that avoids disturbances for customers or other workers.  Under the new Rule, these routine measures could make retailers the "joint employers" for these other companies' employees.  Those retailers, in turn, could be pulled into labor disputes between the contracted companies and those companies' employees, despite having no role in establishing the workers' essential terms and conditions of employment.

16

d.    *Hospitality*.  Like the industries described above, the hospitality industry is largely built on the franchise model, and many industry participants rely on a host of contractors and vendors to support operations.  The many small businesses that make up the industry rely on clear rules delineating who is a "joint employer."  Yet the new Joint Employer Rule throws clarity to the wayside, forcing hotels and the like to reconsider every vendor and contract agreement they sign.  Some may choose not to contract at all.  Others may change policies, to the detriment of employees and the public alike.

e.    *Healthcare*.  The healthcare industry will fare no better.  It too depends on contracted labor—often to fill staffing gaps for nurses and other critical-care workers.  Those contracted workers "typically sign a contract with a staffing agency to occupy a temporary position at a hospital that can range in duration from several days to a few months."  88 Fed. Reg. at 74,002 (Kaplan, M., dissenting).  Under the new Rule, though, "a hospital that maintains (or merely has the authority to maintain) work rules and schedules" for those workers "will be their joint employer"—making the hospital "duty-bound to bargain with the union" that represents the workers "directly employed" by the staffing agency.  *Id.*  A hospital's health and safety policies will have the same effect.  Simply put, the Rule will force hospitals "to spend time and resources that could be devoted to patient care on administrative and management issues as it works to understand the scope of its joint employer liability [and] revises policies, practices, and contracts to address that liability[.]"  *Id.* (first alteration in original).

59.    The new Rule has an especially pernicious effect on the franchise business model generally and the approximately 800,000 franchised businesses operating across hundreds of industries in addition to those noted above.  Franchising is a method of marketing goods and services that depends upon the existence of the franchisor's control over a trademark, other

intellectual property, and often some other commercially desirable interest sufficient to induce franchisees to pay to participate in the franchisor's system by distributing goods or services under the franchisor's trademark or name.

60.     Maintaining brand standards through control over their trademarks allows franchisors to maintain the uniformity and quality of product and service offerings and, in doing so, to protect their trade names, trademarks, service marks, the goodwill associated with these trademarks, and most importantly, the consumer. This likewise benefits franchisees, by allowing them to rely on the experience, reputation, recognized brand, and goodwill of the franchisor in building their own independent business.  Brand standards also help protect consumers by allowing them the ability to know they are dealing with a reputable business that offers a quality product. Because the essence of franchising is the collective use of marks that represent the source and quality of goods and services to the consuming public, action taken to control the uniformity and quality of product and service offerings under those marks is an explicit requirement of federal trademark law.  *See* 15 U.S.C. § 1064(5)(A) (mark may be cancelled "[a]t any time . . . on the ground that the registrant (A) *does not control, or is not able legitimately to exercise control over, the use of such mark*") (emphasis added).

61.     A franchisor's exercise of control over brand standards is not day-to-day management over the business operations of its franchisees. Yet under the new Rule, joint-employer status may be established merely by the indirect or reserved (even if unexercised) control over a broad range of matters, including wages, benefits, and other compensation; hours of work and scheduling; the assignment of duties to be performed; supervision of the performance of duties; work rules and directions governing the manner, means, and methods of performance; grounds for discipline; hiring and firing of employees; and working conditions relating to

employee health and safety.  By enumerating an overbroad list of "essential terms and conditions of employment," the Rule threatens to turn a franchisor's routine exercise of control to ensure the maintenance of brand standards into indicia of joint employment under the NLRA.  This in turn will harm franchisees, as franchisors, facing the threat of joint employer liability, either: (a) scale back on the support, services, and advice they supply to their franchisees; or (b) exert more control over their franchisees to protect themselves, essentially transforming franchisees from independent business owners to middle managers.

62.     The Rule effectively puts franchisors in the virtually impossible position of either: (a) risking forfeiture of their intellectual property in the form of their marks by exerting too little control over their brand standards; or (b) incurring joint employer liability under the NLRA by exerting or reserving too much control.  The Board seeks to elevate (its view of) the goals of federal labor law—and its own authority—over the goals of federal law governing trademarks and franchising which Congress has expressly set forth in the Lanham Act and elsewhere, thus penalizing conduct Congress required franchisors to take under separate federal law.

63.     The new Rule's breadth also poses problems for collective bargaining more generally.  Collective bargaining involves negotiating tradeoffs among competing employer and employee interests.  Yet under the Joint Employer Rule, firms with no meaningful interest and no real leverage will find themselves at the bargaining table.  And the number of firms at any single table will increase dramatically.  As the dissent put it: "It is difficult to imagine a better recipe than [the new Joint Employer Rule] for injecting chaos into the practice and procedure of collective bargaining that the majority claims to promote."  88 Fed. Reg. at 73,999.

64.     The Board cast all these concerns aside by claiming that its hands were tied.  But as explained above and in Member Kaplan's dissent, the Board "misapprehends common-law

agency principles in holding that those principles *compel* the Board to rescind its 2020 Rule . . . and replace it with a joint-employer standard not seen anywhere else in the law." 88 Fed. Reg. at 73,987 (Kaplan, M., dissenting). Because the Board "fail[ed] to engage in any real policy-based choice," the Board's actions must be set aside because its view is not "compelled by the common law and hence the only permissible construction of the Act." *Id.*

65. Finally, the new Rule is unreasonable because it fails to articulate a comprehensible standard with meaningful guidance to regulated parties. As Member Kaplan points out in dissent, the Rule "expressly contemplates that joint-employer status will be determined through adjudication under the common law, not under the provisions" of the Rule—which is exactly what would happen with no rule at all. 88 Fed. Reg. at 74,005.

66. The Board's claim that its new Rule is reasonable because it establishes "a definite, readily available standard" that will "assist employers and labor organizations in complying with the Act" and "reduce uncertainty and litigation over the basic parameters of joint-employer status" is a farce. 88 Fed. Reg. at 73,957. The Rule creates more uncertainties than it solves.

67. The Board's rescission of the 2020 Rule and its promulgation of the new Rule are therefore arbitrary and capricious as well.

## PRAYER FOR RELIEF

For the foregoing reasons, Plaintiffs respectfully request that this Court:

1. Declare unlawful and set aside the Board's rescission of the 2020 Rule and promulgation of the Joint Employer Rule;

2. Declare that the Board's rescission of the 2020 Rule and promulgation of the Joint Employer Rule are arbitrary and capricious;

3.     Enjoin the Board from enforcing its Joint Employer Rule against Plaintiffs'

       members;

4.     Award Plaintiffs their costs and reasonable attorney's fees; and

5.     Grant such other and further relief as the Court deems just and proper.

Dated:  November 9, 2023

Respectfully submitted,

/s/ *Laura P. Warrick*
Laura P. Warrick
   Texas Bar No. 24079546
Akin Gump Strauss Hauer & Feld LLP
2300 N. Field Street, Suite 1800
Dallas, TX 75201
Telephone:  (214) 969-4770
Facsimile:  (214) 969-4343
lwarrick@akingump.com

Stephanie A. Maloney
   D.C. Bar No. 1044276 (*pro hac vice* to be filed)
Jordan L. Von Bokern
   D.C. Bar No. 1032962 (*pro hac vice* to be filed)
U.S. Chamber Litigation Center
1615 H Street, N.W.
Washington, DC 20062-2000
Telephone: (202) 463-5337
smaloney@uschamber.com
jvonbokern@uschamber.com

*Attorneys for the Chamber of Commerce of the United States of America*

Maury Baskin
   D.C. Bar No. 248898 (*pro hac vice* to be filed)
Littler Mendelson
815 Connecticut Avenue, N.W.
Suite 400
Washington, D.C. 20006
Telephone:  (202) 842-3400
Facsimile:  (202) 842-0011
mbaskin@littler.com

*Counsel to Associated Builders and Contractors and International Franchise Association*

Angelo I. Amador
   D.C. Bar No. 480031 (*pro hac vice* to be filed)
Restaurant Law Center
2055 L Street, N.W.
Suite 700
Washington, D.C. 20036
Telephone: (202) 331-5913

*Counsel for the Restaurant Law Center*

Pratik A. Shah (Lead Attorney)
   D.C. Bar No. 497108 (*pro hac vice* to be filed)
James E. Tysse
   D.C. Bar No. 9787522 (*pro hac vice* to be filed)
James C. Crowley
   D.C. Bar No. 208946 (*pro hac vice* to be filed)
Margaret O. Rusconi
   D.C. Bar No. 1719371 (*pro hac vice* to be filed)
Akin Gump Strauss Hauer & Feld LLP
2001 K Street, N.W.
Washington, D.C. 20006
Telephone:  (202) 887-4000
Facsimile:  (202) 887-4288
pshah@akingump.com
jtysse@akingump.com
jcrowley@akingump.com
mrusconi@akingump.com

*Counsel to Plaintiffs Chamber of Commerce of the United States of America, American Hotel and Lodging Association; Associated Builders and Contractors; Associated General Contractors of America; Coalition for a Democratic Workplace; International Franchise Association; Longview Chamber of Commerce; National Association of Convenience Stores; National Retail Federation; Restaurant Law Center; Texas Association of Business; and Texas Restaurant Association*