**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TYLER DIVISION**

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA; AMERICAN HOTEL AND LODGING ASSOCIATION; ASSOCIATED BUILDERS AND CONTRACTORS; ASSOCIATED GENERAL CONTRACTORS OF AMERICA; COALITION FOR DEMOCRATIC WORKPLACE; INTERNATIONAL FRANCHISE ASSOCIATION; LONGVIEW CHAMBER OF COMMERCE; NATIONAL ASSOCIATION OF CONVENIENCE STORES; NATIONAL RETAIL FEDERATION; RESTAURANT LAW CENTER; TEXAS ASSOCIATION OF BUSINESS; and TEXAS RESTAURANT ASSOCIATION, | Civil Action No. 6:23-cv-553 |

Plaintiffs,

v.

NATIONAL LABOR RELATIONS BOARD; LAUREN MCFERRAN, Chair; MARVIN KAPLAN, Board Member; GWYNNE WILCOX, Board Member; and DAVID PROUTY, Board Member,

Defendants.

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND**
**MEMORANDUM OF LAW IN SUPPORT**

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................9

STATEMENT OF UNDISPUTED MATERIAL FACTS ........................................10

    I.      LEGAL FRAMEWORK ........................................................................10

    II.     THE NEW JOINT EMPLOYER RULE.................................................13

STATEMENT OF THE ISSUE..............................................................................16

LEGAL STANDARDS .........................................................................................16

ARGUMENT ......................................................................................................17

    I.      THE JOINT EMPLOYER RULE IS INCONSISTENT WITH THE NLRA'S COMMON-LAW BASED TERMS ..........................................................17

          A.     The New Rule Conflicts With The NLRA Because It Defines "Employers" To Include Entities Without Direct, Immediate, or Substantial Control Over The Essential Terms And Conditions Of Employment........................................................................................17

                         *1.*     *Common-Law Employment Requires Direct and Immediate Control, Not Indirect or Reserved Control Alone*...............................18

                         *2.*     *The New Rule Permits Employer Status Without Direct and Immediate Control* ...............................................................21

                         *3.*     *The New Rule Permits Employer Status Based on De Minimis, Sporadic, or Isolated Control* ...............................................24

          B.     The New Rule Swallows The Common-Law Distinction Between Employees And Independent Contractors. ....................................28

    II.     THE NEW RULE INDEPENDENTLY VIOLATES THE NLRA BY DEFINING EMPLOYERS TO INCLUDE THOSE WHO CANNOT ENGAGE IN MEANINGFUL COLLECTIVE BARGAINING ..............................31

    III.    THE NEW RULE IS ARBITRARY AND CAPRICIOUS BECAUSE THE BOARD IGNORED ITS DISRUPTIVE IMPACTS AND UNCERTAINTY FOR PUTATIVE JOINT EMPLOYERS ..................................................34

CONCLUSION....................................................................................................38

ADDENDUM

    29 C.F.R. § 103.40 (2023) .........................................................Add. 1

    29 C.F.R. § 103.40 (2020) .........................................................Add. 3

# TABLE OF AUTHORITIES

C<small>ASES</small>:

*ACA Int'l v. FCC*,
    885 F.3d 687 (D.C. Cir. 2018) ............................................................38

*Adams & Assocs., Inc. v. NLRB*,
    871 F.3d 358 (5th Cir. 2017) ............................................................21

*Airborne Freight Co.*,
    338 NLRB 597 (2002) ........................................................................21

*Allied Chem. & Alkali Workers of Am., Local Union No. 1 v. Pittsburgh Plate
    Glass Co.*,
    404 U.S. 157 (1971) ...................................................................19, 32

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*,
    988 F.2d 146 (D.C. Cir. 1993) ............................................................38

*AM Prop. Holding Corp.*,
    350 NLRB 998 (2007) ...................................................................20, 21

*Arizona v. Evans*,
    514 U.S. 1 (1995) ...............................................................................23

*Auciello Iron Works, Inc. v. NLRB*,
    517 U.S. 781 (1996) ...................................................................10, 32

*Bettis v. Islamic Rep. of Iran*,
    315 F.3d 325 (D.C. Cir. 2003) ............................................................22

*Browning-Ferris Indus.*,
    362 NLRB 1599 (2015) ...........................................................11, 14, 32

*Browning-Ferris Indus. of Cal., Inc. v. NLRB*,
    911 F.3d 1195 (D.C. Cir. 2018) ................................................. *passim*

*Butler v. Drive Auto Indus. Of Am., Inc.*,
    793 F.3d 404 (4th Cir. 2015) ............................................................19

*Capehardt v. Murta*,
    145 S.W. 827 (Mo. Ct. App. 1912) ......................................................18

*Carey Salt Co. v. NLRB*,
    736 F.3d 405 (5th Cir. 2013) ............................................................35

*Clackamas Gastroenterology Assocs., P.C. v. Wells*,
    538 U.S. 440 (2003) ...........................................................................24

*CNN Am., Inc.*,
    361 NLRB 439 (2014) ...............................................................................11

*Community For Creative Non-Violence v. Reid*,
    490 U.S. 730 (1989).........................................................................11, 29

*Conover v. Board of Equalization*,
    112 P.2d 341 (Cal. Dist. Ct. App. 1941)..............................................28

*Constitution Pub. Co. v. Dale*,
    164 F.2d 210 (5th Cir. 1947) ...............................................................25

*Data Mktg. P'ship, LP v. U.S. Dep't of Lab.*,
    45 F.4th 846 (5th Cir. 2022) ................................................................16

*DHS v. Regents of the Univ. of Cal.*,
    140 S. Ct. 1891 (2020)..........................................................................38

*Dimmitt-Rickhoff-Bayer Real Estate Co. v. Finnegan*,
    179 F.2d 882 (8th Cir. 1950) ...............................................................20

*Doe I v. Wal-Mart Stores, Inc.*,
    572 F.3d 677 (9th Cir. 2009) ...............................................................19

*Dunkin' Donuts Mid-Atl. Dist. Ctr., Inc. v. NLRB*,
    363 F.3d 437 (D.C. Cir. 2004)..............................................................25

*E.I. Dupont de Nemours & Co.*,
    304 NLRB 792 (1991) ..........................................................................34

*E.I. Du Pont de Nemours & Co. v. NLRB*,
    489 F.3d 1310 (D.C. Cir. 2007) ...........................................................34

*FCC* v. *Prometheus Radio Project*,
    141 S. Ct. 1150 (2021)....................................................................34, 38

*Field v. Mans*,
    516 U.S. 59 (1995)................................................................................27

*First Nat'l Maint. Corp. v. NLRB*,
    452 U.S. 666 (1981)..............................................................................32

*Franklin Simon & Co.*,
    94 NLRB 576 (1951) ............................................................................11

*G Wes Ltd. Co.*,
    309 NLRB 225 (1992) ..........................................................................25

4

*Glenn v. Standard Oil Co.*,
    148 F.2d 51 (6th Cir. 1945) ...................................................................20

*Goodman v. Wilson*,
    166 S.W. 752 (Tenn. 1914).................................................................18

*Gulino v. New York State Educ. Dep't*,
    460 F.3d 361 (2d Cir. 2006)...............................................................19

*Herbert Harvey, Inc. v. NLRB*,
    424 F.2d 770 (D.C. Cir. 1969) ...........................................................32

*Hodgson v. Okada*,
    326 F. Supp. 514 (D. Colo. 1971) ......................................................26

*International Chem. Workers Union Local 483 v. NLRB*,
    561 F.2d 253 (D.C. Cir. 1977) ...........................................................21

*Island Creek Coal Co.*,
    279 NLRB 858 (1986) ........................................................................25

*Knitter v. Corvias Military Living, LLC*,
    758 F.3d 1214 (10th Cir. 2014) .........................................................35

*Laerco Transp. & Warehouse*,
    269 NLRB 324 (1984) ..................................................................11, 21

*Local 254, Serv. Emps. Int'l Union, AFL-CIO*,
    324 NLRB 743 (1997) ........................................................................26

*Local 777, Dem. Union Organizing Comm. v. NLRB*,
    603 F.2d 862 (D.C. Cir. 1978) .....................................................26, 29

*Lowery Trucking Co.*,
    177 NLRB 13 (1969) ..........................................................................23

*McDonald v. Ponderosa Enters., Inc.*,
    352 P.3d 14 (Mont. 2015) ..................................................................20

*Mendoza v. Continental Sales Co.*,
    140 Cal. App. 4th 1395 (2006) ..........................................................24

*Michigan v. EPA*,
    576 U.S. 743 (2015)............................................................................34

*Morrison v. Magic Carpet Aviation*,
    383 F.3d 1253 (11th Cir. 2004) .........................................................20

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
 463 U.S. 29 (1983)......................................................................................16

*Nationwide Mort. Ins. Co., v. Darden*,
 503 U.S. 318 (1992).............................................................................25, 29

*New York Indem. Co. v. Industrial Accident Comm'n*,
 14 P.2d 160 (Cal. Dist. Ct. App. 1932)...................................................18

*NLRB v. Browning-Ferris Indus. of Pa., Inc.*,
 691 F.2d 1117 (3d Cir. 1982) (*Browning-Ferris I*) .............................11, 21, 22, 25

*NLRB v. Denver Bldg. & Constr. Trades Council*,
 341 U.S. 675 (1951).............................................................................30, 36

*NLRB v. Hearst Publ'ns*,
 322 U.S. 111 (1944)....................................................................................29

*NLRB v. Town & Country Elec., Inc.*,
 516 U.S. 85 (1995)......................................................................................17

*NLRB v. U.S. Postal Serv.*,
 128 F.3d 280 (5th Cir. 1997) .....................................................................17

*NLRB v. United Ins. Co. of Am.*,
 390 U.S. 254 (1968).................................................................10, 11, 17, 29

*NLRB v. Zayre Corp.*,
 424 F.2d 1159 (5th Cir. 1970) ...................................................................26

*Peter Pan Bus Lines, Inc. v. Federal Motor Carrier Safety Admin.*,
 471 F.3d 1350 (D.C. Cir. 2006) ............................................................17, 37

*Radio City Music Hall Corp. v. United States*,
 135 F.2d 715 (2d Cir. 1943)......................................................................28

*Rhoades v. Varney*,
 39 A. 552 (Me. 1898)..................................................................................18

*S.S. Kresge Co. v. NLRB*,
 416 F.2d 1225 (6th Cir. 1969) ...................................................................26

*SEC v. Chenery Corp.*,
 318 U.S. 80 (1943)......................................................................................16

*Service Emps. Int'l Union, Local 32BJ v. NLRB*,
 647 F.3d 435 (2d Cir. 2011)......................................................................25

*Shenker v. Baltimore & O.R. Co.*
374 U.S. 1 (1963) ..................................................................................20

*Singer Mfg. Co. v. Rahn*,
132 U.S. 518 (1889) ...............................................................................25

*Southern Cal. Gas Co.*,
302 NLRB 456 (1991) .......................................................................26, 30

*Spillson v. Smith*,
147 F.2d 727 (7th Cir. 1945) .................................................................20

*Taft Broad. Co.*,
163 NLRB 475 (1967) ............................................................................35

*Tarron v. Bowen Mach. & Fabricating Co.*,
213 P.3d 309 (Ariz. Ct. App. 2009) ......................................................20

*TLI, Inc.*,
271 NLRB 798 (1984) ............................................................................21

*Williams v. Shell Oil Co.*,
18 F.3d 396 (7th Cir. 1994) ...................................................................20

<u>S**TATUTES**</u>:

5 U.S.C.
§ 706(2) ..................................................................................................16

29 U.S.C.
§ 141(b) ..................................................................................................32
§ 152(2) .............................................................................................11, 32
§ 152(3) ..................................................................................................11
§ 152(5) ..................................................................................................32
§ 158(a)(5) ..............................................................................................10
§ 158(d) ..................................................................................................32
§ 185 .......................................................................................................10
§ 654(a)(1) ..............................................................................................35

Labor Management Relations Act of 1947, Pub. L. No. 80-101, 61 Stat. 136
(codified at 29 U.S.C. §§ 141-197) .......................................................10

National Labor Relations Act, 29 U.S.C. §§ 151 *et seq.* ..............................10

Taft-Hartley Act of 1947 ................................................................................18

**OTHER AUTHORITIES:**

29 C.F.R. (2020)
    § 103.40 .......................................................................................... 12
    § 103.40(a) ............................................................................... 12, 13
    § 103.40(b) ...................................................................................... 13
    § 103.40(d) ............................................................................ 13, 14, 24

29 C.F.R. (2023)
    § 103.40 .......................................................................................... 14
    § 103.40(c) ............................................................................... 14, 22
    § 103.40(d) ............................................................................... 14, 37
    § 103.40(d)(5) ................................................................................. 36
    § 103.40(d)(7) .......................................................................... 31, 36
    § 103.40(e)(1) ................................................................................. 14
    § 103.40(e)(2) ................................................................................. 14
    § 103.40(h)(1) ......................................................................... 15, 33
    § 103.40(h)(2) ................................................................................. 33

85 Fed. Reg. 11,184 (Feb. 26, 2020) ...................................... 12, 33

87 Fed. Reg. 54,641 (Sept. 7, 2022) ............................................. 13

88 Fed. Reg. 73,946 (Oct. 27, 2023) ..................................... *passim*

30 A.L.R. 1000 (1924) ................................................................. 18

FED. R. CIV. P. 56(a) ................................................................... 16

H.R. Rep. No. 245, 80th Cong., 1st Sess., 18 (1947) ................. 19

RESTATEMENT OF EMPLOYMENT LAW § 1.04(b) ..................... 26, 27

RESTATEMENT (SECOND) OF AGENCY
    § 2(1) ............................................................................................. 23
    § 220(1) ......................................................................................... 23
    § 227 ................................................................................. 18, 19, 26

Pursuant to Local Rule CV-56 and Federal Rule of Civil Procedure 56, Plaintiffs move for summary judgment on their claims, which arise under the National Labor Relations Act ("NLRA") and Administrative Procedure Act ("APA").

## INTRODUCTION

The National Labor Relations Board's new Joint Employer Rule, adopted over a strong dissent deeming the Rule "catastrophic," is as destabilizing as it is unlawful. The Rule displaces widely accepted common-law standards governing the scope of employment relationships, establishes entirely new tests of employer liability, reconfigures relationships among legally separate entities, erases distinctions between contractors and employers, and threatens billions of dollars in liability and costs. These sweeping changes were not made in response to any new law or judicial decision. Instead, the Board rammed them through because—it says—the 90-year-old National Labor Relations Act has been misinterpreted for most of its existence. The newly constituted Board's newfound interpretation, moreover, conveniently "requires" reversal of a rule the Board promulgated just three years ago.

This regulatory alchemy reflects three crucial errors. First, the Rule adopts an overbroad interpretation of who is a "joint employer" under the NLRA—imposing joint-and-several liability on virtually every entity that hires contractors subject to routine parameters, defines the terms of those contracts, or collaborates with a third party of any kind in achieving common goals that have an incidental or indirect effect on the third party's employees. But none of that is permitted— never mind required—by the common law. Second, the Rule abandons one of the most important limiting principles in the NLRA: that to be an employer, let alone a joint employer, one must exercise sufficient control over workers' essential terms and conditions of employment to permit meaningful collective bargaining. Finally, the Joint Employer Rule replaces a clear standard, under which entities have tailored their business arrangements, with an arbitrary and uncertain one that

will disrupt those arrangements with untenable consequences for businesses and workers alike across many industries—all on the erroneous premise that the NLRA tied the Board's hands.

To be clear, Plaintiffs and their members do not oppose regulations that require employers to meet their collective-bargaining obligations under the NLRA. In fact, Plaintiffs have long supported the development of a clear joint-employment standard. But the Board's new Rule jettisons the common-law boundaries that define the NLRA and further its purposes. In short: the Joint Employer Rule transgresses the NLRA and is otherwise unlawful under the APA. This Court should set aside the new Rule and the Board's rescission of its previous rule. And as further explained in Plaintiffs' forthcoming motion to expedite, the Court should do so before the new Rule's December 26 effective date.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

## I.    LEGAL FRAMEWORK

Congress enacted the National Labor Relations Act, 29 U.S.C. §§ 151 *et seq.*, to "promot[e] stable collective bargaining relationships" by giving employees freedom of association and imposing obligations on employers to bargain collectively with employee representatives. *Auciello Iron Works, Inc. v. NLRB*, 517 U.S. 781, 790 (1996). When the NLRA applies, failing to bargain can expose an employer to suits for injunctive relief and monetary penalties. *See* 29 U.S.C. § 158(a)(5). And failing to comply with collective-bargaining agreements can expose an employer to costly suits as well. *See* 29 U.S.C. § 185.

In 1947, Congress amended the NLRA in the Taft-Hartley Act to clarify the meaning of "employer" and "employee" in response to Supreme Court precedent that had purported to define "employee" based on general "economic and policy considerations within the labor field," rather than common-law principles. *NLRB v. United Ins. Co. of Am.*, 390 U.S. 254, 256 (1968); *see* Labor Management Relations Act of 1947, Pub. L. No. 80-101, 61 Stat. 136 (codified at 29 U.S.C.

§§ 141-197) ("Taft-Hartley Amendments"). Although the Taft-Hartley Amendments did not define "employer" (other than to circularly state that it included "any person acting as an agent of an employer, directly or indirectly," 29 U.S.C. § 152(2)), the Amendments defined "employee" to exclude "any individual having the status of an independent contractor," *id.* § 152(3). The Supreme Court thus understood that the Amendments' "obvious purpose" was "to have the Board and the courts apply general agency principles," not labor and economic policies, "in distinguishing between employees and independent contractors under the Act." *United Ins.*, 390 U.S. at 256 ("[T]here is no doubt that we should apply the common law agency test.").

The Board also has long recognized that two entities can sometimes be considered "joint employers" of particular employees—making each employer obligated to bargain collectively with those employees under the NLRA. *See, e.g.*, *Franklin Simon & Co.*, 94 NLRB 576, 579 (1951). But the NLRA does not define "joint employer." Instead, like the definition of "employer" or "employee," Congress expected the Board and the courts to apply common-law agency principles. *See Community For Creative Non-Violence v. Reid*, 490 U.S. 730, 739-740 (1989).

For decades, the Board drew from the common law a straightforward framework: firms were "joint employers" if they exercised "direct," "immediate," and "substantial" control over the same employees' essential terms of employment. *See, e.g.*, *CNN Am., Inc.*, 361 NLRB 439, 441 (2014); *Laerco Transp. & Warehouse*, 269 NLRB 324, 325 (1984); *see also NLRB v. Browning-Ferris Indus. of Pa., Inc.*, 691 F.2d 1117 (3d Cir. 1982) (*Browning-Ferris I*). Not only did that test follow the common law, but it also ensured putative joint employers had enough control over the essential terms and conditions of employment to permit meaningful collective bargaining.

Things changed in 2015, however, when the Board decided in *Browning-Ferris* that "compelling policy reasons" warranted a different approach. *Browning-Ferris Indus.*, 362 NLRB

1599, 1600, 1611 (2015). The Board announced a new test allowing a "joint employer" finding whenever a firm exercised "indirect" control over the terms of employment for another firm's employees, or even just a "reserved right" to control the same. And given the parties' contract for reimbursement of labor costs (a frequent feature of third-party contracting relationships), the Board concluded that each had exercised sufficient "indirect" control over employees to be considered joint employers for purposes of NLRA compliance.

The D.C. Circuit later reversed in part, holding that the Board (i) "provided no blueprint for what counts as 'indirect' control," (ii) "failed to differentiate between those aspects of indirect control relevant to status as an employer, and those quotidian aspects of common-law third-party contract relationships," and (iii) "never delineated what terms and conditions" of employment the two entities needed to control to make collective bargaining "meaningful." *Browning-Ferris Indus. of Cal., Inc. v. NLRB*, 911 F.3d 1195, 1220-1222 (D.C. Cir. 2018) (*Browning-Ferris II*). Although the court found that indirect and reserved control might be relevant to determining joint-employer status, it expressly declined to decide whether such indirect or reserved control *alone* would be sufficient. *See id.*

In response to the D.C. Circuit's decision, the Board addressed the court's admonitions and largely reinstated the longstanding joint-employer standard that had been in place for decades until 2015. *See* 85 Fed. Reg. 11,184 (Feb. 26, 2020), codified at 29 C.F.R. § 103.40 ("2020 Rule") (*see* Addendum). The 2020 Rule provided that an entity is "a joint employer of a separate employer's employees only if the two employers share or codetermine the employees' essential terms and conditions of employment." *Id*. § 103.40(a). And though "[e]vidence of the entity's indirect control over essential terms and conditions of employment" was "probative" of joint-employer status, it was not sufficient. *Id*. Rather, "[t]o establish" joint-employer status, the 2020 Rule

required that "the entity must possess and exercise such substantial direct and immediate control" with "a regular or continuous consequential effect on an essential term or condition of employment" so as to "meaningfully" permit collective bargaining. *Id.* § 103.40(a), (d). The word "substantial," moreover, was defined to exclude control that is "only exercised on a sporadic, isolated, or de minimis basis." *See id.* § 103.40(d); *see also* 88 Fed. Reg. 73,946, 73,948 (Oct. 27, 2023). The 2020 Rule also defined a limited set of discrete "essential terms and conditions of employment"—namely, "wages, benefits, hours of work, hiring, discharge, discipline, supervision, and direction." 29 C.F.R. § 103.40(b).

## II. THE NEW JOINT EMPLOYER RULE

The 2020 Rule did not last long. In 2022, a newly constituted Board proposed to rescind and replace the 2020 Rule on the ground that the common law purportedly required joint-employer status to be determined not only through an employer's direct, immediate, and substantial control over employees, but also through solely indirect and reserved control. *See* Standard for Determining Joint-Employer Status, 87 Fed. Reg. 54,641 (Sept. 7, 2022). The Board received nearly 13,000 comments—mostly critical—in response. As the Board acknowledged, many commenters (including Plaintiff U.S. Chamber) argued that the proposed rule would make it harder to reach agreements in collective bargaining. 88 Fed. Reg. at 73,974 (attached as Exhibit A); *see also* U.S. Chamber of Commerce Comment ("Chamber Comment") at 31 (attached as Exhibit B) (proposed rule would create "unworkable" outcomes for entities "forced to the bargaining table" with "only limited rights of control or indirect control"). Commenters posed the problem that a broader joint-employer standard would turn routine company-to-company dealing into joint employment of their respective employees. 88 Fed. Reg. at 73,970; *see also* Chamber Comment at 16. Other commenters raised industry-specific concerns. For example, they argued that the proposed rule would inhibit franchisors from exercising the controls necessary to protect their

brands, thereby jeopardizing the federal trademark rights of franchisors and the investment of franchisees in brand consistency that consumers value. 88 Fed. Reg. at 73,979; *see also* Chamber Comment at 33-34; Comments of International Franchise Association ("IFA Comment") (attached as Exhibit C) at 36-39. Commenters contended that a broader rule would expose contractors on multiemployer construction jobs, 88 Fed. Reg. at 73,970; *see also* Chamber Comment at 34-35, and disincentivize hospitals from relying on travel nurses to meet critical care needs. 88 Fed. Reg. at 73,960; *see also* Chamber Comment at 36-37.

Despite this barrage of commentary, on October 27, 2023, the Board published the Joint Employer Rule, which largely mirrors the proposed rule, and rescinded the 2020 Rule. *See* 88 Fed. Reg. 73,946, codified at 29 C.F.R. § 103.40 (*see* Addendum). Specifically, the new Rule provides that a firm is a "joint employer" if it "possess[es] the authority to control (whether directly, indirectly, or both), or to exercise the power to control (whether directly, indirectly, or both), one or more of the employees' essential terms and conditions of employment." 29 C.F.R. § 103.40(c). The Rule stresses that control need not be "exercised." *Id.* § 103.40(e)(1). Indirect control is likewise "sufficient." *Id.* § 103.40(e)(2). And in place of the 2020 Rule's discrete list of essential terms of employment, the new Rule introduced several new and vague categories, such as "[w]ork rules and directions governing the manner, means, and methods of the performance," and "[w]orking conditions related to the safety and health of employees." *Id.* § 103.40(d).

The Rule is also significant for what it does not say. The Board discarded the former provision excluding control "exercised on a sporadic, isolated, or de minimis basis." 29 C.F.R. § 103.40(d) (2020). Also missing is the Board's former limiting principle that joint-employer status requires the putative joint employer to possess "sufficient control over employees' essential terms and conditions of employment to permit meaningful collective bargaining." *Browning*

*Ferris*, 362 NLRB at 1600.  Instead, the Board reasoned that other aspects of the Rule meant that all bargaining *necessarily* will be meaningful.  88 Fed. Reg. at 73,972, 73,982.  Yet, once a firm is deemed a joint employer, the Rule requires that firm to "bargain collectively . . . with respect to any term and condition of employment that it possesses the authority to control or exercises the power to control, regardless of whether that term . . . is deemed to be . . . essential."  29 C.F.R. § 103.40(h)(1).

Member Kaplan dissented, deeming the Rule "catastrophic to the statutory goal of facilitating effective collective bargaining."  88 Fed. Reg. at 73,987.  He began by explaining the Rule's inconsistency with the common law, as well as the "extreme and troubling changes to Board law."  *Id.* at 73,990.  He pointed out the majority's failure "to cite a single judicial decision" that "bases a joint-employer finding solely on a never-exercised contractual reservation of right to control or an indirect control."  *Id.* at 73,992.

Member Kaplan next detailed the Rule's many policy flaws—flaws that went largely ignored based on the Board's faulty premise that the common law tied its hands.  *See, e.g.*, 88 Fed. Reg. 73,978 (Board observing that, "[i]nsofar as the Act itself requires the Board to conform to common-law agency principles in adopting a joint-employer standard," commenters' policy "concerns seem misdirected").  He faulted the Board majority for "fail[ing] to grapple with the reality that their joint-employer standard is likely to frustrate collective bargaining and erect barriers to reaching collective-bargaining agreements."  88 Fed. Reg. 73,998.  He then detailed what that scenario could look like in a variety of industries—ranging from foodservice to healthcare—and the practical problems it could create.  *Id.* at 74,000-74,004.  Yet the majority "brush[es] [these concerns] aside."  *Id.* at 74,000.

Finally, Member Kaplan explained that the majority's claim to provide "a definite and readily available standard" that will "reduce uncertainty and litigation" is "simply untrue." 88 Fed. Reg. 74,005. The Rule "offers no greater certainty or predictability than adjudication, and it will not reduce litigation, because it expressly contemplates that joint employer status will be determined through adjudication under the common law, not under the provisions of the final rule, in most cases." *Id.* The new Rule is thus a "step backward" from the 2020 Rule. *Id.* The majority "fails to acknowledge" that reality and offers no "good reasons" for the change. *Id.*

For all these reasons, Member Kaplan concluded that the Joint Employer Rule is both contrary to law and arbitrary and capricious.

## STATEMENT OF THE ISSUE

Whether the Board violated the NLRA and APA in promulgating the Joint Employer Rule.

## LEGAL STANDARDS

A district court should grant a movant summary judgment when "there is no genuine dispute as to any material fact." FED. R. CIV. P. 56(a). Under the APA, a reviewing court must set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2). An agency decision is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Nor can agency action "stand if the agency has misconceived the law." *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943). Agencies must act "within a zone of reasonableness and, in particular . . . , reasonably consider[] the relevant issues and

reasonably explain[] the decision." *Data Mktg. P'ship, LP v. U.S. Dep't of Lab.*, 45 F.4th 846, 855 (5th Cir. 2022).

## ARGUMENT

## I. THE JOINT EMPLOYER RULE IS INCONSISTENT WITH THE NLRA'S COMMON-LAW BASED TERMS

The Board's expansive new interpretation of "joint employer" cannot be reconciled with the NLRA. The NLRA does not define the term "joint employer." But under the common-law principles that the NLRA incorporates, a joint-employer relationship has two main requirements: (1) the joint employer must exert direct, immediate, and substantial control over the essential terms and conditions of employment, and (2) that control must be distinct from and greater than that found in common-law independent contractor relationships. The new Rule fails to account for either principle and thus is contrary to law.

### A. The New Rule Conflicts With The NLRA Because It Defines "Employers" To Include Entities Without Direct, Immediate, or Substantial Control Over The Essential Terms And Conditions Of Employment

As a threshold matter, the Board has no special expertise, and should be afforded no deference, in interpreting the common law, including the definition of "employer." *See NLRB v. Town & Country Elec., Inc.*, 516 U.S. 85, 94-95 (1995) (noting definition of "employer" under NLRA is governed by "common-law agency principles"); *see also Browning-Ferris II*, 911 F.3d at 1206-1207 (The NLRA's "test for joint-employer status is determined by the common law of agency."). Instead, the content and meaning of the common law is a pure question of law that courts review *de novo* without deference to the Board. *See United Ins.*, 390 U.S. at 260 (meaning of common law is a "pure" question of law, and its resolution requires "no special administrative expertise that a court does not possess"); *accord NLRB v. U.S. Postal Serv.*, 128 F.3d 280, 283 n.3 (5th Cir. 1997). Moreover, deference is inappropriate when an "agency wrongly believes that

interpretation is compelled by Congress." *Peter Pan Bus Lines, Inc. v. Federal Motor Carrier Safety Admin.*, 471 F.3d 1350, 1354 (D.C. Cir. 2006) (internal quotation marks omitted). As shown below, the meaning of the relevant common law is clear, and the Board's interpretation is wrong.

> 1.  *Common-Law Employment Requires Direct and Immediate Control, Not Indirect or Reserved Control Alone*

When the NLRA was amended in the Taft-Hartley Act of 1947, a "joint employer" was widely understood to be a person who exercises direct and immediate control over the work being performed in an employment relationship. The common-law consensus required that joint employers must "exercise ordinary care in view of the circumstances of the situation, so that the servant shall not be exposed to dangers that may be prevented by the exercise of such care." *Rhoades v. Varney*, 39 A. 552, 553 (Me. 1898); *see also* 30 A.L.R. 1000 (1924) (defining "joint employment" as "relation of master and servant between the injured person and each of the other persons from whom he derived income for his services"). And to show that a second employer assumed such a duty of care over another firm's employee, there had to be shared "operation and control" over the employee's work. *Capehardt v. Murta*, 145 S.W. 827, 828 (Mo. Ct. App. 1912); *see also New York Indem. Co. v. Industrial Accident Comm'n*, 14 P.2d 160, 161-162 (Cal. Dist. Ct. App. 1932) ("joint employer" must "superintend" the work of another employer's employee "even to the extent of discharging him"); *Goodman v. Wilson*, 166 S.W. 752, 753 (Tenn. 1914) ("joint employer" is "founded on the superintendence and control which the master is supposed to exercise over his servant").

The Restatement (Second) of Agency—published about 15 years before the Taft-Hartley Amendments—likewise recognizes that direct and immediate control was required to form a master-servant relationship. Specifically, the Restatement provides that an employee "can become the servant of another only if there are the same elements in his relation to the other as would

constitute him a servant of the other were he not ordinarily the servant of the first." RESTATEMENT

(SECOND) OF AGENCY § 227 (1933). Thus, a relationship between two separate entities—where

one exercises direct control over working conditions and the other has only an indirect or

unexercised right of control—would be insufficient. The Restatement's illustrations show the

same. *See id.*, illus. 1 ("In the absence of evidence that [the passenger or client] is to control the

details as to the management of the cab, the driver is [the cab owner's] servant while driving the

cab"); *id.*, illus. 5 (worker remains in supplier's employment only unless user "assumes control

over the manner of" performing contracted work).

The requirement of "direct" and immediate control is also how Congress interpreted the

common law when it enacted the Taft-Hartley Amendments. The accompanying House Report

emphasized that "[e]mployees work for wages or salaries *under direct supervision*." H.R. Rep.

No. 245, 80th Cong., 1st Sess., 18 (1947) (emphasis added). Citing the same report, the Supreme

Court later held that employees who have ceased working *directly* for an employer cannot be

considered "employees" under the NLRA. *Allied Chem. & Alkali Workers of Am., Local Union

No. 1 v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 391-392 (1971).

Modern common-law cases continue down the same path—holding that actual and direct,

not hypothetical and indirect, control is necessary for finding joint employment. *See, e.g.*, *Butler

v. Drive Auto Indus. Of Am., Inc.*, 793 F.3d 404, 414 (4th Cir. 2015) (joint employment requires

"day-to-day supervision of the individual, including employee discipline"); *Doe I v. Wal-Mart

Stores, Inc.*, 572 F.3d 677, 683 (9th Cir. 2009) (retailer was not the joint employer of supplier's

employees because retailer's control "d[id] not constitute an 'immediate level of day-to-day'

control . . . so as to create an employment relationship"); *Gulino v. New York State Educ. Dep't*,

460 F.3d 361, 379 (2d Cir. 2006) (common-law employment standard "focuses largely on the

extent to which the alleged master has 'control' over the day-to-day activities of the alleged 'servant'" and requires "a relationship where the level of control is direct, obvious, and concrete, not merely indirect or abstract"); *Morrison v. Magic Carpet Aviation*, 383 F.3d 1253, 1256 (11th Cir. 2004) (no joint employment relationship where there was "no evidence that [the company] had direct control over [the employee], rather than the indirect control over a service provider's employees that a customer may obtain by contracting with that service provider").

The common-law "loaned servant" doctrine further emphasizes the need for direct control. The doctrine addresses the legal status of workers of a "supplier" company (*e.g.*, a staffing agency) who are loaned to assist another "user" company, and has long deemed the "immediate control and supervision" of workers "critical" in determining "for whom" the workers are performing services. *Shenker v. Baltimore & O.R. Co.* 374 U.S. 1, 6 (1963); *see also Glenn v. Standard Oil Co.*, 148 F.2d 51 (6th Cir. 1945) (requiring direct control in finding operators of distribution plants were not employees of contractor); *Spillson v. Smith*, 147 F.2d 727 (7th Cir. 1945) (requiring direct control in finding the musicians of an orchestra were the employees of its leader and not the restaurant where they played); *Dimmitt-Rickhoff-Bayer Real Estate Co. v. Finnegan*, 179 F.2d 882 (8th Cir. 1950) (requiring direct control in finding real estate agents were not employees); *Williams v. Shell Oil Co.*, 18 F.3d 396, 399 (7th Cir. 1994) ("[O]ne cannot be considered a loaned servant unless the power to control the employee is totally given over to the second employer"); *accord Tarron v. Bowen Mach. & Fabricating Co.*, 213 P.3d 309, 316-318 (Ariz. Ct. App. 2009); *McDonald v. Ponderosa Enters., Inc.*, 352 P.3d 14, 19 (Mont. 2015).

For decades, the Board responded to these settled common-law principles with an easily applied rule: It required direct and immediate control of employees—not mere indirect or reserved (*i.e.*, potential) control—before a company could be deemed a joint employer of another

20

company's employees, including for collective-bargaining purposes. *See, e.g.*, *AM Prop. Holding Corp.*, 350 NLRB 998, 999-1002 (2007); *Airborne Freight Co.*, 338 NLRB 597, 597 n.1 (2002); *TLI, Inc.*, 271 NLRB 798, 798-799 (1984); *Laerco*, 269 NLRB at 325-326; *see also International Chem. Workers Union Local 483 v. NLRB*, 561 F.2d 253, 255-257 (D.C. Cir. 1977).

Importantly, that straightforward rule was upheld time and again by the courts. Most notably, the Third Circuit—citing authority from the Supreme Court as well as the Fourth, Fifth, Sixth, Seventh, Eighth, and Ninth Circuits—explicitly embraced the Board's actual "control" test:

> We hold therefore that in the context of this case, the Board chose the correct standard—the "joint employer" standard—to apply to its analysis of the facts of this case: *where two or more employers exert significant control over the same employees*—where from the evidence it can be shown that they share or co-determine those matters governing essential terms and conditions of employment—they constitute 'joint employers' within the meaning of the NLRA.

*Browning-Ferris I*, 691 F.2d at 1124 (emphasis added) (citing cases). The Fifth Circuit has explicitly "endorsed" that test. *Adams & Assocs., Inc. v. NLRB*, 871 F.3d 358, 377 (5th Cir. 2017) (citing *Browning-Ferris I* and *Laerco*). Applying that test, the Fifth Circuit held that the "reservation of [the] right to discipline [another employer's] staff for violation of rules and policies is insufficient to establish a joint-employer finding, absent evidence that the right was ever exercised"; rather, the Board must "look[] to the actual practice of the parties." *Id.* (quoting *AM Prop. Holding Corp.*, 350 NLRB 998, 1000 (2007)). Against that clear holding, the Joint Employer Rule does not cite a single case reversing (or even seriously questioning) the Board's longstanding "direct and immediate control" test as being inconsistent with the common law—powerful evidence that that test accurately captures the proper meaning of the term "employee" under the NLRA and that the Board misconceived the law.

> 2.    *The New Rule Permits Employer Status Without Direct and Immediate Control*

The new Joint Employer Rule conflicts with the common law and Fifth Circuit precedent

by abandoning the longstanding "direct and immediate control" requirement. In fact, the Rule *mandates* a joint-employer finding based on less: merely possessing the "authority" to control a single essential term of employment is enough, even without contractually reserved control. 29 C.F.R. § 103.40(c). And a firm is a "joint employer" whenever it exercises control "indirectly"— and not just through an intermediary. *Id.*

Perhaps the most notable aspect of the Board's new Rule is the lack of precedent in its favor. Indeed, the Board "majority fails to cite a single judicial decision, much less a body of court precedent rising to the level of establishing the common law, that bases a joint-employer finding solely on a never-exercised contractual reservation of right to control or on indirect control of employees' essential terms and conditions." 88 Fed. Reg. 73,992 (Kaplan Dissent). That alone is sufficient to show that the Rule is inconsistent with the "common law." *See Bettis v. Islamic Rep. of Iran*, 315 F.3d 325, 333 n.9 (D.C. Cir. 2003) (rejecting interpretation of common law when "no case" supported that interpretation).

The Board insists that the Third Circuit and D.C. Circuit "endorsed" its new test in *Browning-Ferris I* and *II*. 88 Fed. Reg. at 73,982. But, as Member Kaplan explains in his dissent, 88 Fed. Reg. at 73,991, 73,994, that is a gross misreading of both opinions. As noted, in *Browning-Ferris I*, the Third Circuit held that two employers are joint employers only if they "exert significant control over the same employees." 691 F.2d at 1124. And the Joint Employer Rule discards that test.

As for *Browning-Ferris II*, the D.C. Circuit held that the Board's joint-employer test properly permitted consideration of indirect or reserved control as factors bearing on the joint-employer question, but the test nevertheless "overshot the common-law mark" by failing to distinguish evidence of control that bears on workers' essential terms and conditions of

employment from evidence that simply documents the routine parameters of company-to-company contracting. 911 F.3d at 1216. The court certainly did not hold that reserved or indirect control *alone* would be sufficient; it specifically deferred those questions. *See id.* at 1213, 1218. Simply put, nothing in *Browning-Ferris II*'s approves the Board's expanded definition of a joint employer.[1]

The Board also cited two different sections of the Restatement (Second) of Agency to support the proposition that either (1) potential or (2) indirect control is sufficient to establish an entity as a joint employer. But neither suffices. With respect to reserved control, the Board relied on Section 2(1), which defines a "master" as someone who "controls or has the right to control" another, and Section 220(1), which defines a servant as someone "subject to [an]other's control or right to control." RESTATEMENT (SECOND) OF AGENCY §§ 2(1), 220(1). But those Sections address whether a worker is an employee in evaluating the vicarious liability of a putative employer—not whether there is a *second* employer in the mix. Sections 2 and 220 of the Restatement recognize that if an employer retains its right to control an employee, it cannot sever the employer-employee relationship merely by allowing the employee to work autonomously—and thereby protect itself from vicarious liability for an employee's torts. *See Arizona v. Evans*, 514 U.S. 1, 29 n.5 (1995) (explaining that "the risk of *respondeat superior* liability encourages employers to supervise more closely their employees' conduct"). But that logic does not apply in the context of joint employment, where employees are already being directly supervised by at least one employer and the question is only whether a *second* employer should also be held liable. The vicarious liability

---

[1] For similar reasons, the Board's prior decisions finding reserved or indirect control to be "probative" of joint employer status do not help it because those employers *also* exercised direct and immediate control. *See, e.g.*, *Lowery Trucking Co.*, 177 NLRB 13, 15 (1969) (finding freight company was joint employer of drivers supplied by trucking company based on actual supervision, participation in the hiring process, discharge of two drivers, and discipline of a third).

doctrine is designed to ensure employees are supervised by an employer, not to ensure that employees are supervised by multiple employers simultaneously.

Regarding "indirect" control, the Board relies on Restatement Section 5, which codifies the common-law "sub-servant" doctrine, under which a worker's helper is deemed an agent of both the worker *and* the employer. But that specialized doctrine is not relevant here. It involves one linked relationship: both the sub-servant and servant are still servants of a single master. *See, e.g.*, *Mendoza v. Continental Sales Co.*, 140 Cal. App. 4th 1395, 1405-1406 (2006) (explaining that a subagent is the agent of a principal because of a fiduciary duty that flows from the principal to the agent to the subagent). By contrast, in the joint-employer context, one employer is *not* the servant of the other, and it therefore does not implicate concerns unique to the sub-servant context.

In sum: the common law and Fifth Circuit precedent require "direct and immediate control," the cases the Board cites do not show otherwise, and the new Rule tosses those requirements aside.

3. *The New Rule Permits Employer Status Based on De Minimis, Sporadic, or Isolated Control*

Even if the Board could demonstrate that indirect control alone, or reserved control alone, is sufficient to establish joint-employer status, the Rule would fail for another reason: it allows a finding of employment based on de minimis, sporadic, or isolated control, without any showing of *substantial* control over the "means and manner" in which the employee works. Although the 2020 Rule specifically excluded control that was "only exercised on a sporadic, isolated, or de minimis basis," 29 C.F.R. § 103.40(d) (2020), the Joint Employer Rule discards that limitation.

The "touchstone" at common law is whether the putative employer sufficiently controls putative employees. *See Clackamas Gastroenterology Assocs., P.C. v. Wells*, 538 U.S. 440, 448-449 (2003). It has long been recognized that for a putative employer's control to be "sufficient,"

the employer must control the means and manner in which the employee performs work. *See, e.g.*, *Singer Mfg. Co. v. Rahn*, 132 U.S. 518, 523 (1889) ( "[T]he relation of master and servant exists whenever the employer retains the right to direct the manner in which the business shall be done, as well as the result to be accomplished, or, in other words, 'not only what shall be done, but how it shall be done.'").

Under these conventional limitations, occasional direction or isolated supervision are insufficient. An employer must "control the manner and means by which the product is accomplished" on a daily basis. *Nationwide Mort. Ins. Co. v. Darden*, 503 U.S. 318, 323 (1992); *see also Browning-Ferris I*, 691 F.2d at 1123 (asking whether there is "sufficient control of the terms and conditions of employment of the employees who are employed by the other employer"); *accord Dunkin' Donuts Mid-Atl. Dist. Ctr., Inc. v. NLRB*, 363 F.3d 437, 440 (D.C. Cir. 2004).

Around the same time as the Taft-Hartley Amendments amended the NLRA to include its current definitions of "employer" and "employee," the Fifth Circuit held that a joint employer must exercise sufficient "control" of an employee so as to be "an instrumentality or adjunct of" the employer. *Constitution Pub. Co. v. Dale*, 164 F.2d 210, 213 (5th Cir. 1947). Over the next several decades, federal courts distinguished examples of "limited and routine supervision" as insufficient to establish joint-employer status. *See, e.g.*, *Service Emps. Int'l Union, Local 32BJ v. NLRB*, 647 F.3d 435, 443 (2d Cir. 2011) ("limited and routine supervision consisting of directions of where to do a job rather than how to do the job and the manner in which to perform the work is typically insufficient to create a joint employer relationship" (internal quotation marks and citations omitted)); *G Wes Ltd. Co.*, 309 NLRB 225, 226 (1992) ("'[M]erely routine directions of where to do a job rather than how to do the job and the manner in which to perform the work' are insufficient to support a joint employer finding") (quoting *Island Creek Coal Co.*, 279 NLRB 858, 864 (1986));

*Local 254, Serv. Emps. Int'l Union, AFL-CIO*, 324 NLRB 743, 746-749 (1997) (no joint employment where employer regularly directed employees to perform specific tasks at particular times but did not instruct employees how to perform work); *Southern Cal. Gas Co.*, 302 NLRB 456, 461-462 (1991) (direction of workers insufficient to establish joint employment where employer did not control wages or benefits, or hire or fire employees).

Over that same period, courts (including the Fifth Circuit) held that "substantial" or "pervasive control" over the essential terms and conditions of employment was required. *See, e.g.*, *NLRB v. Zayre Corp.*, 424 F.2d 1159, 1165 (5th Cir. 1970) (noting person who "exercised or had the potential to exercise substantial control over the employment practices of [employees] was in practical effect a joint-employer"); *Hodgson v. Okada*, 326 F. Supp. 514, 519 (D. Colo. 1971) ("The requisite degree of control" for joint employment includes "exercise of the right to fire an employee, plus the right to direct the daily labor."). And where there was merely shared "general control over the operational policies," and "no common control over the labor relations," there could be no joint-employer relationship. *S.S. Kresge Co. v. NLRB*, 416 F.2d 1225, 1228 (6th Cir. 1969); *see also Local 777, Dem. Union Organizing Comm. v. NLRB*, 603 F.2d 862, 898 (D.C. Cir. 1978) (requiring "pervasive control").

The Restatement (Second) of Agency is in accord. It explains that a worker's decision to "obey[] the requests of the temporary employer as to the act does not necessarily cause him to be the servant of such employer." RESTATEMENT (SECOND) OF AGENCY § 227, cmt. D (1933). The more recent Restatement of Employment Law, which the Board ignores, likewise requires substantial, not de minimis, control to establish joint-employer status. RESTATEMENT OF EMPLOYMENT LAW § 1.04(b) ("An individual is an employee of two or more joint employers if . . . [the] employer and the other joint employers each control or supervise such rendering of

services.").  In a section addressing the joint-employer doctrine, the Restatement of Employment Law gives the following illustration:

> A is a driver of a large concrete-mixer truck owned and operated by the P corporation.  The R construction company rents the truck for a particular project.  P assigns A to operate the truck in accord with P's mechanical and safety specifications while it is used on R's project.  R's supervisors tell A what work they want the truck to accomplish.  A's compensation is set by P and is paid by P.  If dissatisfied with A, R can request that P assign another driver.  Only P can discharge A.  A is an employee of P but not R.  P alone sets the terms of A's compensation and controls the details of how A is to operate the truck in providing service to R.

*Id.* § 1.04, illus. 5.  In this illustration, R's power to terminate P's employee, A, is at best indirect: "If dissatisfied with A, R can request that P assign another driver.  Only P can discharge A."  "R's supervisors tell A what work they want the truck to accomplish," rather than directing A on how to perform the work.  Under the 2020 Rule, which requires "substantial" control, the Board could not contend that R is a joint employer of A, because R's direct power was limited and routine.  Under the new Rule, by contrast, the Board would likely contend that R is a joint employer of A, because R can exercise limited, indirect control.

In short, control (let alone indirect or reserved control standing alone) is insufficient if it is merely isolated, sporadic, or de minimis.  The 2020 Rule had properly excluded such insubstantial control.  But the new Rule fails to do so, in direct violation of common-law principles and Fifth Circuit precedent.

*** 

The Board may have thought the new Rule is what the law *should* be.  Indeed, the Board said as much.  88 Fed. Reg. at 73,984 n.402 ("the final rule reflects our policy choices").  But there is no judicial authority—much less a "judicial consensus" sufficient to establish a common-law rule—that joint-employer status can be based on the indirect, reserved, or limited control the Rule allows.  *Field v. Mans*, 516 U.S. 59, 70 n.9 (1995).  The Rule is thus contrary to law.

### B. The New Rule Swallows The Common-Law Distinction Between Employees And Independent Contractors.

The Joint Employer Rule conflicts with the NLRA another way as well: it swallows the common-law distinction between employees and independent contractors. Despite the D.C. Circuit's instruction to the Board to promulgate a rule that distinguishes joint employers from common-law independent contractor relationships, the new Rule fails "to hew to the relevant common-law boundaries that prevent the Board from trenching on the common and routine decisions that employers make when hiring third-party contractors and defining the terms of those contracts." *Browning-Ferris II*, 911 F.3d at 1219.

Anyone who contracts for services—such as plumbing or painting—inevitably exercises (or at least reserves) some measure of control over the contractors by defining the parameters of the desired result. Accordingly, courts have long recognized the need to distinguish between a true employment relationship and a contractual one. For example, in a case applying common-law principles to decide that a production company did not employ certain vaudeville entertainers, Judge Learned Hand wrote that the company "did intervene to some degree" but like "a general building contractor intervene[s] in the work of his subcontractors." *Radio City Music Hall Corp. v. United States*, 135 F.2d 715, 717-718 (2d Cir. 1943). Like a general contractor, the company "decide[d] how the different parts of the work must be timed, and how they shall be fitted together," because "[s]ome such supervision is inherent in any joint undertaking, and does not make the contributing contractors employees." *Id.*; *see also Conover v. Board of Equalization*, 112 P.2d 341 (Cal. Dist. Ct. App. 1941) (quotidian details defining job duties are irrelevant to employee versus independent contractor status).

In the Taft-Hartley Amendments, Congress wrote that distinction between employees and independent contractors directly into the NLRA, in response to a Supreme Court decision holding

"newsboys"—adults who distributed newspapers on street corners—were "employees" of the newspaper publishers. *NLRB v. Hearst Publ'ns,* 322 U.S. 111, 113-114 (1944). "Congress was so incensed with the fanciful construction of its legislative intention in *Hearst* that in 1947 it specifically excluded 'independent contractors' from the coverage of the Act and condemned the Court's rationale in *Hearst Publications* as giving 'far-fetched meanings' to the words that Congress had used." *Local 777, Democratic Union Org. Comm.*, 603 F.2d at 905.

The Supreme Court later recognized that, under the NLRA, the Board must "apply the common law agency test . . . in distinguishing an employee from an independent contractor." *United Ins. Co.*, 390 U.S. at 256; *see id.* (one purpose of the Taft-Hartley Amendments "was to have the . . . courts apply general agency principles in distinguishing between employees and independent contractors under the Act"). The Court held that distinguishing contractors from employees requires considering the hiring party's control over "the manner and means by which the product is accomplished," which depends on such relevant factors as

> the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*Darden*, 503 U.S. at 323-324 (quoting *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 751-752 (1989)).

Citing these common-law principles, the D.C. Circuit in *Browning-Ferris II* recognized that any "joint employer" rule promulgated by the Board must respect the distinction between independent contracting and joint-employment relationships—*i.e.*, differentiate between those aspects of control relevant to status as an employer versus those "quotidian aspects of common-law

29

third-party contractual relationships." *Browning-Ferris II*, 911 F.3d at 1220. Specifically, any test must recognize that "[s]ome such supervision is inherent in any joint undertaking, and does not make the contributing contractors employees." *Id.* (alteration in original).

The Board's 2020 Rule did just that by requiring joint employers to exercise direct, immediate, and substantial control over a discrete and defined list of essential terms and conditions of employment. And that rule was consistent with longstanding Board and judicial precedent. *See, e.g.*, *Southern Cal. Gas Co.*, 302 NLRB at 461 (Although "[a]n employer receiving contracted labor services will of necessity exercise" a certain amount of control over the contractor, that "is not in and of itself, sufficient justification for . . . a joint employer finding."); *NLRB v. Denver Bldg. & Constr. Trades Council*, 341 U.S. 675, 689-690 (1951) (contractor's mere exercise of supervision over a subcontractor's work does "not eliminate the status of each as an independent contractor").

But the new Joint Employer Rule jettisons those requirements. The Rule provides no rubric for distinguishing between the sort of "indirect" and "reserved" control a putative employer might exercise over a true employee versus a mere contractor. As the dissent explained, the Rule "does not adequately distinguish" evidence of indirect or reserved control "that bears on workers' essential terms and conditions of employment from evidence that simply documents the routine parameters of company-to-company contracting." 88 Fed. Reg. at 79,991, 73,995-73,996 (internal quotation marks omitted). According to the Board majority, "limiting the list of essential terms and conditions of employment is responsive" to the D.C. Circuit's admonition in *Browning-Ferris II* that "the Board incorporate a limiting principle" within "common-law boundaries." 88 Fed. Reg. at 73,991. But, as the dissent correctly concluded, "closing the list of essential terms and conditions is not enough because routine components of company-to-company contracts may

indirectly impact essential terms." 88 Fed. Reg. at 73,991. For example, a contract for services may make the general contractor "responsible for initiating, maintaining, and supervising all safety precautions and programs in connection with the performance of the [c]ontract." *Id.* (alteration in original). That clause is "a routine component of company-to-company contracting." *Id.* But under the Rule, it also "evidences the general contractor's indirect control (at least) of working conditions related to the safety and health of employees" of its subcontractors. *Id.* (internal quotation marks omitted). The contractor's limited control via this routine contract clause—also an "essential" term of employment under the Rule—would render it a joint employer. 29 C.F.R. § 103.40(d)(7).

Far from providing "legal scaffolding" that keeps the inquiry within the common-law bounds, *see Browning-Ferris II*, 911 F.3d at 1220, the new Rule thus rides roughshod over Supreme Court precedent that recognized contracting enterprises often have some influence over the work performed by each other's workers without destroying their status as independent employers. By allowing entities to be considered joint employers of their independent contractors' employees, the Rule swallows the common-law distinction that Congress incorporated into the NLRA.

## II. THE NEW RULE INDEPENDENTLY VIOLATES THE NLRA BY DEFINING EMPLOYERS TO INCLUDE THOSE WHO CANNOT ENGAGE IN MEANINGFUL COLLECTIVE BARGAINING

Beyond conflicting with the key common-law terms in the NLRA, the Rule violates the NLRA by permitting the "joint employer" definition to sweep in putative employers who have no meaningful ability to bargain with employees over essential terms and conditions of employment.

In *Browning-Ferris II*, the D.C. Circuit observed that the Board's prior joint-employer test had two steps: first, whether there was a common-law joint employment relationship; and second, "whether the putative joint employer possesses sufficient control over employees' essential terms and conditions of employment to permit meaningful collective bargaining." 911 F.3d at 1221. "In

other words, according to the Board, the existence of a common-law employment relationship is necessary, but not sufficient, to find joint-employer status [under the Act]." *Id.* (internal quotation marks omitted) (alteration in original).

The "vital second step" of the test, *Browning-Ferris II*, 911 F.3d at 1215, was necessary due to the structure and purpose of the NLRA. The NLRA's declared purpose is to achieve "industrial peace and stability, fostered by collective-bargaining agreements." *Auciello*, 517 U.S. at 790 (citing 29 U.S.C. § 141(b)). Congress imposed obligations on "employers" and "labor organizations" to "bargain collectively" "with respect to wages, hours, and other terms and conditions of employment." 29 U.S.C. § 158(d); *id.* §§ 152(2), (5). Some management decisions, such as layoffs and recalls, are almost exclusively "an aspect of the relationship" between employer and employee, and plainly must be bargained. *Pittsburgh Plate Glass Co.*, 404 U.S. at 178. But "in establishing what issues must be submitted to the process of bargaining," Congress imposed "an undeniable limit"—namely, that management decisions with "only an indirect and attenuated impact on the employment relationship" need not be bargained. *First Nat'l Maint. Corp. v. NLRB*, 452 U.S. 666, 676-677 (1981).

For that reason, it would be incongruous to interpret "employer" under the NLRA, as the new Rule does, to require bargaining with an entity that has limited control over only one essential term or condition, and to require that entity to bargain over all other non-essential terms and conditions over which it has control (even if only reserved or indirect). To the contrary, courts have long held that the only reasonable reading of the NLRA's coverage provisions is one that recognizes that an employer must have "sufficient control over the working conditions" of employees "to enable it to bargain effectively." *Herbert Harvey, Inc. v. NLRB*, 424 F.2d 770, 772 (D.C. Cir. 1969). Indeed, as noted, that was the Board's own prior rule. *See Browning-Ferris*, 362

NLRB at 1600 (even if common law would deem a business to be a joint employer, the Board will also ask "whether the putative joint employer possesses sufficient control over employees' essential terms and conditions of employment to permit meaningful collective bargaining"); *see also* 2020 Rule, 85 Fed. Reg. at 11,235 (control must be sufficient to "meaningfully affect[ ] matters relating to the employment relationship").

The new Rule inexplicably abandons the requirement of "meaningful collective bargaining." It does not require putative joint employers to have sufficient control over all or most traditional mandatory subjects of bargaining—*e.g.*, wages, benefits hours of work, hiring, and discharge. Collective bargaining involves negotiating tradeoffs among competing employer and employee interests. Yet under the Rule, firms with no meaningful interest and no real leverage will find themselves at the bargaining table. That is because the Rule makes irrelevant the extent of control necessary to make informed decisions and tradeoffs at the bargaining table. What's more, the Rule mandates collective bargaining "with respect to any term and condition of employment" that a putative joint employer has "the authority to control or exercises the power to control" indirectly, "regardless of whether that term or condition is deemed to be an essential term and condition of employment." 29 C.F.R. § 103.40(h)(1). The Rule thus imposes collective-bargaining obligations upon entities that lack sufficient control over such essential terms as wages, hours, and other terms and conditions of employment to bargain a comprehensive collective-bargaining agreement.

The Board attempted to sidestep this problem by limiting the bargaining obligations of a joint employer under the Rule to the terms over which it "possesses the authority to control or exercises the power to control." 29 C.F.R. § 103.40(h)(1), (2). But, in doing so, the Board effectively concedes that a joint employer under the Rule could only engage in piecemeal

bargaining.  The Board and courts have recognized that the fundamental "statutory purpose of requiring good-faith bargaining would be frustrated if parties were permitted, or indeed required, to engage in piecemeal bargaining."  *E.I. Du Pont de Nemours & Co. v. NLRB*, 489 F.3d 1310, 1317 (D.C. Cir. 2007) (quoting *E.I. Dupont de Nemours & Co*., 304 NLRB 792, 792 n.1 (1991)); *see id.* (a party has a "right to insist on negotiating an entire contract rather than engaging in piecemeal negotiation over particular issues").  Indeed, as the dissent explains, such bargaining will create labor instability, not fix it:  "It is difficult to imagine a better recipe than today's final rule for injecting chaos into the practice and procedure of collective bargaining that the majority claims to promote."  88 Fed. at Reg. 73,999.  The Rule is thus contrary to law.

## III.   THE NEW RULE IS ARBITRARY AND CAPRICIOUS BECAUSE THE BOARD IGNORED ITS DISRUPTIVE IMPACTS AND UNCERTAINTY FOR PUTATIVE JOINT EMPLOYERS

The APA "requires that agency action be reasonable and reasonably explained." *FCC* v. *Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). "[R]easonable regulation ordinarily requires paying attention to the advantages *and* the disadvantages of agency decisions." *Michigan v. EPA*, 576 U.S. 743, 753 (2015).  As the dissent recognized, the "majority's final rule is neither reasonable nor reasonably explained" for multiple reasons, 88 Fed. Reg. at 74,005, including because (1) it ignores the serious practical problems it creates on the premise that the common law tied the Board's hands, and (2) it fails to articulate a comprehensible standard with meaningful guidance to regulated parties.

1.  By claiming that the common law compelled the Board to act, the Rule largely backhands the many real-world problems created by the Joint Employer Rule, including the Rule's practical effect on collective bargaining and the unworkable consequences it would produce.  The dissent gave the following illustration:

> CleanCo is in the business of supplying maintenance employees to clients to clean their offices. . . . CleanCo supplies employees to one hundred clients, and . . . each CleanCo-client contract contains a provision that gives the client the right to prohibit, on health and safety grounds, CleanCo's employees from using particular cleaning supplies. Because the clients possess a contractually reserved authority to control "working conditions related to the safety and health of employees"—an essential employment term newly invented by my colleagues—each of those one hundred clients would be a joint employer of CleanCo's employees.

88 Fed. Reg. at 73,987. That result could mean that all one hundred CleanCo clients would be compelled to participate in collective bargaining with CleanCo's employees. But so large a bargaining table would "frustrate rather than facilitate reaching agreements." 88 Fed. Reg. at 73,999. The competing interests of all one hundred joint employers "might well be in conflict," 88 Fed. Reg. at 73,999, and the parties may quickly conclude they have "exhausted the prospects of concluding an agreement" and declare an impasse. *Carey Salt Co. v. NLRB*, 736 F.3d 405, 417 (5th Cir. 2013) (emphasis omitted) (quoting *Taft Broad. Co*., 163 NLRB 475, 478 (1967)).

This illustration also highlights the dilemma that the Rule creates for employers who adopt general safety protocols on their property. Courts have acknowledged that employers "naturally would be concerned about [their vendor's employees'] safety, even if only for liability purposes, just as they would for any employee or non-employee on premises." *Knitter v. Corvias Military Living, LLC*, 758 F.3d 1214, 1230 (10th Cir. 2014). And for good reason, as the Occupational Safety and Health Act imposes a general duty to ensure that "a place of employment" is "free from recognized hazards." 29 U.S.C. § 654(a)(1). But, because the rule makes "working conditions related to the safety and health of employees" an essential term of employment, an entity responding to a hazardous condition could become a joint employer of every worker employed by another entity on its property (*e.g.*, vendors and contractors). The dissent was right to point out that this result "creates a perverse incentive for companies to avoid protecting the employees of

other employers or to avoid maintaining safety standards or applying safety measures that are any more protective than legally-mandated minimums." 88 Fed. at Reg. 74,004.

The Board further ignored the disruptive impact of the Rule on various industries. Take the franchise industry first. As the dissent explained, "countless" franchise systems require "monitoring of franchisees' cleanliness and hygiene protocols to protect brand standards." 88 Fed. Reg. at 74,001; IFA Decl. ¶ 9; RLC Decl. ¶ 17; AHLA Decl. ¶ 13. Many franchisors also include clauses in their franchising agreements that allow them to maintain control over the use of their marks. *See, e.g.*, RLC Decl. ¶ 17. Yet it is entirely foreseeable that these long-accepted practices would make franchisors joint employers of their franchisees' employees under either or both of two newly adopted (yet capacious and vague) terms that the Board deems "essential": "[w]ork rules and directions governing the manner, means, and methods of the performance" or "[w]orking conditions related to the safety and health of employees." 29 C.F.R. § 103.40(d)(5), (7); IFA Decl. ¶ 9; RLC Decl. ¶ 17; AHLA Decl. ¶ 13; *see also* NRF Decl. ¶ 9. It is equally foreseeable, as the dissent recognized, that the Rule would displace the franchise model altogether by requiring franchisors to "distance their franchisees" or by "turning previously independent owners of franchisees into glorified managers." 88 Fed. Reg. at 74,001.

The new Rule poses similar concerns for the construction industry. The Supreme Court recognized that a construction contractor may have "some supervision over the subcontractor's work" without making "the employees of one the employees of the other." *Denver Bldg. & Constr. Trades Council*, 341 U.S. at 689-690. And, as the dissent explained, general contractors are usually responsible for correcting "hazardous conditions" on job sites and "ultimately determine[] the duration of each part of the construction project." 88 Fed. Reg. at 74,004; ABC Decl. ¶¶ 8-9; AGC Decl. ¶ 8. The Rule ignores these realities by expanding the list of "essential" terms to include

"tenure of employment," "safety and health," and "[w]ork rules." 29 C.F.R. § 103.40(d). The dissent correctly concluded that indirect or potential control of these ill-defined categories will almost certainly "be used to make general contractors in the construction industry joint employers per se." 88 Fed. Reg. at 74,004.

That conclusion applies equally to other contractor relationships that "necessarily involve exercise of control" over another employer's workers. 88 Fed. Reg. at 73,995 n.452. For example, hospitals use contracted labor to fill staffing gaps in nurses and other critical care workers. The 2020 Rule removed from the joint-employer question decisions concerning necessary "staffing levels to accomplish tasks" or "minimal hiring standards," but the new Rule provides no exceptions for routine contractor decisions. 88 Fed. Reg. at 73,990. The dissent was correct to warn that the resulting uncertainty would force many industries that provide critical services to choose between bringing "their contracted-out work in-house" (and "incur unexpected costs") or forgoing their services through "reduced headcount or other cost-saving measures that could impact workers." 88 Fed. Reg. at 74,002.

Faced with all these problems, the Board's primary response is that its newfound reading of the NLRA ties its hands—and that the many substantive concerns expressed by commenters thus "seem misdirected." 88 Fed. Reg. at 73,978; *see id.* at 73,984 n.402 ("[T]he 2020 rule's actual-exercise requirement is impermissible under the Act as contrary to common law agency principles."). But where, as here, an agency asserts that its action is legally compelled, and that legal premise turns out to be incorrect, the action must be set aside. *See, e.g.*, *Peter Pan Bus Lines*, 471 F.3d at 1354. Even putting aside the Board's incorrect legal interpretation, "the courts have made clear that the Board may adopt a joint-employer standard under the NLRA that does not extend to the outermost limits of the common law." 88 Fed. Reg. at 73,987 (Kaplan Dissent); *see,*

*e.g.*, *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1910-1915 (2020) (holding agency acted arbitrarily and capriciously in rescinding prior policy, regardless of whether policy was unlawful). Thus, the Board's failure to "reasonably explain[]" its decision in light of the significant public comments is a separate and independent APA violation. *Prometheus Radio*, 141 S. Ct. at 1158.

2. The Rule exacerbates those problems by creating *more* uncertainty, not less, for putative employers. "If a purported standard is indiscriminate and offers no meaningful guidance to affected parties, it will fail the requirement of reasoned decisionmaking." *ACA Int'l v. FCC*, 885 F.3d 687, 700 (D.C. Cir. 2018) (internal quotation marks omitted). That describes this Rule perfectly. The Board justified the new Rule by claiming it would establish "a definite, readily available standard" and "reduce uncertainty and litigation." 88 Fed. Reg. at 73,957. But beyond providing a nebulous and uncertain standard (under which indirect, reserved control over a single employment term can suffice for joint-employer status), the Rule "expressly contemplates that joint-employer status will be determined through adjudication under the common law, not under the provisions" of the Rule. 88 Fed. Reg. at 74,005 (Kaplan Dissent). The Board's approach thus defeats the purpose of rulemaking: the Board does not dispute that "[a]bsent any rule whatsoever, joint-employer status would be determined through case-by-case adjudication applying the common law of agency." *Id.* The Rule is thus arbitrary and capricious for that reason as well. *See Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 152-153 (D.C. Cir. 1993) (agency's rationale for regulatory action failed to support mechanism chosen in final rule).

## CONCLUSION

The Court should set aside the Joint Employer Rule, enjoin its application, and vacate the Board's rescission of the 2020 Rule (before the new Rule's December 26 effective date).

Dated: November 13, 2023

Respectfully submitted,

/s/ *Pratik A. Shah*

Stephanie A. Maloney
  D.C. Bar No. 1044276 (*pro hac vice* to be filed)
Jordan L. Von Bokern
  D.C. Bar No. 1032962 (*pro hac vice* to be filed)
U.S. Chamber Litigation Center
1615 H Street, N.W.
Washington, DC 20062-2000
Telephone: (202) 463-5337
smaloney@uschamber.com
jvonbokern@uschamber.com

*Attorneys for the Chamber of Commerce of the United States of America*

Maury Baskin
  D.C. Bar No. 248898 (*pro hac vice* to be filed)
Littler Mendelson
815 Connecticut Avenue, N.W.
Suite 400
Washington, D.C. 20006
Telephone: (202) 842-3400
Facsimile: (202) 842-0011
mbaskin@littler.com

*Counsel to Associated Builders and Contractors and International Franchise Association*

Angelo I. Amador
  D.C. Bar No. 480031 (*pro hac vice* to be filed)
Restaurant Law Center
2055 L Street, N.W.
Suite 700
Washington, D.C. 20036
Telephone: (202) 331-5913

*Counsel for the Restaurant Law Center*

Pratik A. Shah (Lead Attorney)
  D.C. Bar No. 497108 (*pro hac vice*)
James E. Tysse
  D.C. Bar No. 9787522 (*pro hac vice*)
James C. Crowley
  D.C. Bar No. 208946 (*pro hac vice*)
Margaret O. Rusconi
  D.C. Bar No. 1719371 (*pro hac vice*)
Akin Gump Strauss Hauer & Feld LLP
2001 K Street, N.W.
Washington, D.C. 20006
Telephone: (202) 887-4000
Facsimile: (202) 887-4288
pshah@akingump.com
jtysse@akingump.com
jcrowley@akingump.com
mrusconi@akingump.com

Laura P. Warrick
  Texas Bar No. 24079546
Akin Gump Strauss Hauer & Feld LLP
2300 N. Field Street, Suite 1800
Dallas, TX 75201
Telephone: (214) 969-4770
Facsimile: (214) 969-4343
lwarrick@akingump.com

*Counsel to Plaintiffs Chamber of Commerce of the United States of America; American Hotel and Lodging Association; Associated Builders and Contractors; Associated General Contractors of America; Coalition for a Democratic Workplace; International Franchise Association; Longview Chamber of Commerce; National Association of Convenience Stores; National Retail Federation; Restaurant Law Center; Texas Association of Business; and Texas Restaurant Association*

## CERTIFICATE OF SERVICE

The undersigned certifies that on November 13, 2023, the foregoing document was electronically submitted with the clerk of the court for the United States District Court, Eastern District of Texas, using the electronic case file system of the court. I hereby certify that I have served all counsel of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

*/s/ Pratik A. Shah*
Pratik A. Shah

**ADDENDUM**

**TABLE OF CONTENTS**

29 C.F.R. § 103.40 (2023)..................................................................................Add. 1

29 C.F.R. § 103.40 (2020)..................................................................................Add. 3

**Code of Federal Regulations**

**Title 29. Labor**

**Subtitle B. Regulations Relating to Labor**

**Chapter I. National Labor Relations Board**

**Part 103. Other Rules**

**Subpart E. Joint Employers**

**§ 103.40 Joint Employers (2023)**

(a)     An employer, as defined by section 2(2) of the National Labor Relations Act (the Act), is an employer of particular employees, as defined by section 2(3) of the Act, if the employer has an employment relationship with those employees under common-law agency principles.

(b)     For all purposes under the Act, two or more employers of the same particular employees are joint employers of those employees if the employers share or codetermine those matters governing employees' essential terms and conditions of employment.

(c)     To "share or codetermine those matters governing employees' essential terms and conditions of employment" means for an employer to possess the authority to control (whether directly, indirectly, or both), or to exercise the power to control (whether directly, indirectly, or both), one or more of the employees' essential terms and conditions of employment.

(d)     "Essential terms and conditions of employment" are

   (1)     Wages, benefits, and other compensation;

   (2)     Hours of work and scheduling;

   (3)     The assignment of duties to be performed;

   (4)     The supervision of the performance of duties;

   (5)     Work rules and directions governing the manner, means, and methods of the performance of duties and the grounds for discipline;

   (6)     The tenure of employment, including hiring and discharge; and

   (7)     Working conditions related to the safety and health of employees.

(e)     Whether an employer possesses the authority to control or exercises the power to control one or more of the employees' essential terms and conditions of employment is determined under common-law agency principles. For the purposes of this section:

     (1)     Possessing the authority to control one or more essential terms and conditions of employment is sufficient to establish status as a joint employer, regardless of whether control is exercised.

     (2)     Exercising the power to control indirectly (including through an intermediary) one or more essential terms and conditions of employment is sufficient to establish status as a joint employer, regardless of whether the power is exercised directly.

(f)     Evidence of an entity's control over matters that are immaterial to the existence of an employment relationship under common-law agency principles and that do not bear on the employees' essential terms and conditions of employment is not relevant to the determination of whether the entity is a joint employer.

(g)     A party asserting that an employer is a joint employer of particular employees has the burden of establishing, by a preponderance of the evidence, that the entity meets the requirements set forth in paragraphs (a) through (f) of this section.

(h)     A joint employer of particular employees

     (1)     Must bargain collectively with the representative of those employees with respect to any term and condition of employment that it possesses the authority to control or exercises the power to control, regardless of whether that term or condition is deemed to be an essential term and condition of employment under this section for the purposes of establishing joint-employer status; but

     (2)     Is not required to bargain with respect to any term and condition of employment that it does not possess the authority to control or exercise the power to control.

(i)     The provisions of this section are intended to be severable. If any paragraph of this section is held to be unlawful, the remaining paragraphs of this section not deemed unlawful are intended to remain in effect to the fullest extent permitted by law.

**Code of Federal Regulations**

**Title 29. Labor**

**Subtitle B. Regulations Relating to Labor**

**Chapter I. National Labor Relations Board**

**Part 103. Other Rules**

**Subpart E. Joint Employers**

**§ 103.40 Joint Employers (2020)**

(a)    An employer, as defined by Section 2(2) of the National Labor Relations Act (the Act), may be considered a joint employer of a separate employer's employees only if the two employers share or codetermine the employees' essential terms and conditions of employment. To establish that an entity shares or codetermines the essential terms and conditions of another employer's employees, the entity must possess and exercise such substantial direct and immediate control over one or more essential terms or conditions of their employment as would warrant finding that the entity meaningfully affects matters relating to the employment relationship with those employees. Evidence of the entity's indirect control over essential terms and conditions of employment of another employer's employees, the entity's contractually reserved but never exercised authority over the essential terms and conditions of employment of another employer's employees, or the entity's control over mandatory subjects of bargaining other than the essential terms and conditions of employment is probative of joint-employer status, but only to the extent it supplements and reinforces evidence of the entity's possession or exercise of direct and immediate control over a particular essential term and condition of employment. Joint-employer status must be determined on the totality of the relevant facts in each particular employment setting. The party asserting that an entity is a joint employer has the burden of proof.

(b)    "Essential terms and conditions of employment" means wages, benefits, hours of work, hiring, discharge, discipline, supervision, and direction.

(c)    "Direct and Immediate Control" means the following with respect to each respective essential employment term or condition:

    (1)    Wages. An entity exercises direct and immediate control over wages if it actually determines the wage rates, salary or other rate of pay that is paid to another employer's individual employees or job classifications. An entity does not exercise direct and immediate control over wages by entering into a cost-plus contract (with or without a maximum reimbursable wage rate).

    (2)    Benefits. An entity exercises direct and immediate control over benefits if it actually determines the fringe benefits to be provided or offered to another employer's employees. This would include selecting the benefit plans (such as

health insurance plans and pension plans) and/or level of benefits provided to another employer's employees. An entity does not exercise direct and immediate control over benefits by permitting another employer, under an arm's-length contract, to participate in its benefit plans.

(3)     Hours of work. An entity exercises direct and immediate control over hours of work if it actually determines work schedules or the work hours, including overtime, of another employer's employees. An entity does not exercise direct and immediate control over hours of work by establishing an enterprise's operating hours or when it needs the services provided by another employer.

(4)     Hiring. An entity exercises direct and immediate control over hiring if it actually determines which particular employees will be hired and which employees will not. An entity does not exercise direct and immediate control over hiring by requesting changes in staffing levels to accomplish tasks or by setting minimal hiring standards such as those required by government regulation.

(5)     Discharge. An entity exercises direct and immediate control over discharge if it actually decides to terminate the employment of another employer's employee. An entity does not exercise direct and immediate control over discharge by bringing misconduct or poor performance to the attention of another employer that makes the actual discharge decision, by expressing a negative opinion of another employer's employee, by refusing to allow another employer's employee to continue performing work under a contract, or by setting minimal standards of performance or conduct, such as those required by government regulation.

(6)     Discipline. An entity exercises direct and immediate control over discipline if it actually decides to suspend or otherwise discipline another employer's employee. An entity does not exercise direct and immediate control over discipline by bringing misconduct or poor performance to the attention of another employer that makes the actual disciplinary decision, by expressing a negative opinion of another employer's employee, or by refusing to allow another employer's employee to access its premises or perform work under a contract.

(7)     Supervision. An entity exercises direct and immediate control over supervision by actually instructing another employer's employees how to perform their work or by actually issuing employee performance appraisals. An entity does not exercise direct and immediate control over supervision when its instructions are limited and routine and consist primarily of telling another employer's employees what work to perform, or where and when to perform the work, but not how to perform it.

(8)     Direction. An entity exercises direct and immediate control over direction by assigning particular employees their individual work schedules, positions, and tasks. An entity does not exercise direct and immediate control over direction by setting schedules for completion of a project or by describing the work to be accomplished on a project.

(d)     "Substantial direct and immediate control" means direct and immediate control that has a regular or continuous consequential effect on an essential term or condition of employment of another employer's employees. Such control is not "substantial" if only exercised on a sporadic, isolated, or de minimis basis.

(e)     "Indirect control" means indirect control over essential terms and conditions of employment of another employer's employees but not control or influence over setting the objectives, basic ground rules, or expectations for another entity's performance under a contract.

(f)     "Contractually reserved authority over essential terms and conditions of employment" means the authority that an entity reserves to itself, under the terms of a contract with another employer, over the essential terms and conditions of employment of that other employer's employees, but that has never been exercised.