**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TYLER DIVISION**

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA; AMERICAN HOTEL AND LODGING ASSOCIATION; ASSOCIATED BUILDERS AND CONTRACTORS; ASSOCIATED GENERAL CONTRACTORS OF AMERICA; COALITION FOR DEMOCRATIC WORKPLACE; INTERNATIONAL FRANCHISE ASSOCIATION; LONGVIEW CHAMBER OF COMMERCE; NATIONAL ASSOCIATION OF CONVENIENCE STORES; NATIONAL RETAIL FEDERATION; RESTAURANT LAW CENTER; TEXAS ASSOCIATION OF BUSINESS; and TEXAS RESTAURANT ASSOCIATION, | |
| Plaintiffs, | Civil Action No. 6:23-cv-00553-JCB |
| v. | |
| NATIONAL LABOR RELATIONS BOARD; LAUREN MCFERRAN, Chair; MARVIN KAPLAN, Board Member; GWYNNE WILCOX, Board Member; and DAVID PROUTY, Board Member, | |
| Defendants. | |

**BRIEF OF AMERICAN HOSPITAL ASSOCIATION AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

INTEREST OF AMICUS CURIAE ........................................................................... 1

INTRODUCTION .................................................................................................... 2

ARGUMENT ........................................................................................................... 4

I.      The Final Rule Imposes Significant and Disproportionate Harm on Hospitals ................ 5

        A.      The Final Rule Harms Hospitals Due to their Necessary Reliance on
                Contract Labor ..................................................................................... 6

        B.      The Final Rule Punishes Hospitals for Responsible Health and Safety
                Measures ............................................................................................. 8

        C.      The Final Rule Has a Dramatic Impact on Federal Funding Schemes ............... 10

        D.      The Final Rule Fails to Recognize the Unique Labor Issues Faced by
                Hospitals ............................................................................................ 12

II.     The NLRA Did Not Require the Board to Ignore the AHA's Concerns ......................... 14

CONCLUSION ...................................................................................................... 18

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Browning-Ferris Indus. of California, Inc. v. NLRB,*
  911 F.3d 1195 (D.C. Cir. 2018) ...............................................................................10, 15

*Chamber of Comm. of U.S. v. U.S. SEC,*
  85 F.4th 760 (5th Cir. 2023) ...............................................................................17

*Clarke v. Commodity Futures Trading Comm'n,*
  74 F.4th 627 (5th Cir. 2023) ...............................................................................4

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.,*
  140 S. Ct. 1891 (2020) ...............................................................................15

*FCC v. Fox Television Stations, Inc.,*
  556 U.S. 502 (2009) ...............................................................................16

*Gresham v. Azar,*
  950 F.3d 93 (D.C. Cir. 2020) ...............................................................................16

*Huawei Techs. USA, Inc. v. FCC,*
  2 F.4th 421 (5th Cir. 2021) ...............................................................................4, 16

*Laborers Int'l Union of N.A. Local Union No. 1057 v. NLRB,*
  567 F.2d 1006 (D.C. Cir. 1977) ...............................................................................12

*Mexican Gulf Fishing Co. v. U.S. Dep't of Comm.,*
  60 F.4th 956 (5th Cir. 2023) ...............................................................................4

*Mobil Oil Exploration & Producing Se. Inc. v. United Distribution Cos.,*
  498 U.S. 211 (1991) ...............................................................................16

*NLRB v. Baptist Hosp., Inc.,*
  442 U.S. 773 (1979) ...............................................................................12

*St. John's Hospital & Sch. of Nursing,*
  222 NLRB 1150 (1976) ...............................................................................12, 15

*Sw. Elec. Power Co. v. EPA,*
  920 F.3d 999 (5th Cir. 2019) ...............................................................................17

*Texas v. Biden,*
  10 F. 4th 538 (5th Cir. 2021) ...............................................................................11

*Univ. of Tex. M.D. Anderson Cancer Ctr. v. United States,*
  985 F.3d 472 (5th Cir. 2021) ...............................................................................14

*Wages & White Lion Invs., L.L.C. v. U.S. Food & Drug Admin.*,
  16 F.4th 1130 (5th Cir. 2021) ................................................................11

STATUTES

Act of July 26, 1974, Pub. L. No. 93-360, 88 Stat. 395.................................12

OTHER AUTHORITIES

29 C.F.R. § 103.40 (2022) ..........................................................................15

29 C.F.R. § 103.40 ........................................................................... *passim*

42 C.F.R. § 482.12 .......................................................................................8

42 C.F.R. § 482.15 .......................................................................................8

42 C.F.R. § 482.23 .......................................................................................8

42 C.F.R. § 482.41 .......................................................................................8

88 Fed. Reg. 73946 (Oct. 27, 2023)................................................. *passim*

Am. Consultants, *Navigating Major Staffing Shortages in Healthcare*
  (June 28, 2019)..........................................................................................6

Am. Hosp. Ass'n, *Comments on the NLRB's Notice of Proposed Rulemaking Re:
  the Standard for Determining Joint Employer Status* (Nov. 2023)................. *passim*

Am. Hosp. Ass'n, *The Financial Stability of America's Hospitals and Health
  Systems Is at Risk as the Costs of Caring Continue to Rise* (Apr. 2023).................6

Am. Hosp. Ass'n, *Hospital and Health Systems Face Unprecedented Financial
  Pressures Due to COVID-19* (May 2020) ...................................................6

*Collective-Bargaining Units in the Health Care Industry*, 52 Fed. Reg. 25142
  (July 2, 1987) ...........................................................................................13

Robert I. Field, *Why Is Health Care Regulation So Complex?*,
  33 Pharmacy & Therapeutics 607 (Oct. 2006) ..........................................10

Victor E. Schwartz & Phil Goldberg, *Carrots and Sticks: Placing Rewards As
  Well As Punishment in Regulatory and Tort Law*, 51 Harv. J. Legis. 315
  (2014)......................................................................................................10

Syntellis & Am. Hosp. Ass'n, *Hospital Vitals: Financial and Operational Trends:
  Workforce Pressures Take Their Toll in 2022* (Feb. 2023) ...........................6

## INTEREST OF AMICUS CURIAE

The American Hospital Association (AHA) is a national not-for-profit association that represents the interests of more than 5,000 hospitals, health care systems, and other health care organizations, as well as 43,000 individual members. It is the largest organization representing the interests of the Nation's hospitals. AHA members are committed to improving the health of the communities they serve. The AHA educates its members on health care issues and advocates on their behalf in legislative, regulatory, and judicial fora to ensure that their perspectives are considered in formulating policy.

Hospitals and health systems often rely on outside contractors to perform a variety of functions, including nursing, environmental services, dietary and food services, security, and maintenance.  And as the AHA explained to the National Labor Relations Board (NLRB), labor costs are a major cause of increased financial strain on the AHA's members. As such, the AHA's member-hospitals, most of which are subject to the National Labor Relations Act (NLRA), have a strong interest in ensuring that the NLRA is not misinterpreted in ways that inhibit their ability to rely on contract workers to meet critical staffing needs, further increase their labor costs, and divert limited resources from patient care.

The AHA agrees with Plaintiffs that the Final Rule at issue here violates the Administrative Procedure Act (APA) and submits this brief to explain why it is arbitrary and capricious in the unique context of the hospital and health care industry.

1

## INTRODUCTION

The National Labor Relations Board has adopted a sweeping test for "joint employer" status that no one had understood to be the law under the National Labor Relations Act in the 90 years since it was enacted. When the Board first proposed its novel test, the American Hospital Association submitted a comment letter explaining how the Board's interpretation of the NLRA would inflict severe harm on hospitals by reclassifying many outside contract workers as hospital "employees."  In the wake of the Covid-19 pandemic, the AHA wrote, hospitals face a dual crisis of financial hardship and workforce shortages, requiring them to rely on staffing agencies to fill many roles that are critical for patient care with the very outside contract workers that will be deemed "joint employees" under the Board's newfangled test.

Giving short shrift to the AHA's comments, the Final Rule makes these financial and workforce problems even worse. It deems hospitals to be "joint employers" of contract workers if hospitals have even minimal unexercised, indirect control over their "working conditions" related to health and safety.  Because hospitals have both a legal and professional duty to control health and safety conditions for everyone working in the hospital environment, the Final Rule could result in virtually every outside contract worker being classified as part of a "joint employment" relationship with the hospital.

By expanding the definition of joint employment in such a far-reaching fashion, the Final Rule will penalize hospitals for adopting responsible workplace policies. It will throw a wrench into the complex federal funding schemes that currently pay for patient care. And it will disrupt hospitals' staffing arrangements, forcing hospitals and contractors into impractical, unnecessary, and costly bargaining.  In imposing these burdens, the Final Rule departs from the Board's and the

Supreme Court's longstanding recognition of the unique labor issues that hospitals face, which require tailored regulatory solutions instead of the Final Rule's one-size-fits-all approach.

As Plaintiffs' brief points out, these hospital-specific concerns were called to the Board's attention during the rulemaking process. *See* Dkt. 10, at 14, 37. But instead of addressing these concerns in any meaningful fashion, the Board largely sidestepped them. If it wasn't brushing off commenters' reasonable concerns with conclusory responses, the Board was wrongly insisting that its hands were tied. According to the Board, the NLRA does not allow any alternative approaches to the "joint employer" inquiry that would accommodate the AHA's legitimate concerns. The Board used this erroneous legal position as an excuse for failing to address and respond to the serious problems that the AHA identified in its comment letter.

This Court should not allow the Board to hide behind flawed legal reasoning and conclusory answers to the reasonable concerns of the AHA and other commenters. It is implausible to suggest that the NLRA *requires* the novel and sweeping "joint employer" test that the Board has recently devised, which nobody ever understood the NLRA to require for the first nine decades of the statute's existence. And even if the Board's novel rewriting of the law were somehow *permissible* under the NLRA, there is no serious question that the Board had discretion to adopt a less sweeping standard. For one thing, the Board could have adopted the approach reflected in its own previous rule in 2020, which was consistent with the statute and the common-law understanding of joint employment. Or, at the very least, the Board had discretion to tailor the Final Rule to ameliorate the harms on the hospital field. Indeed, the Board has long recognized that hospital labor relations present unique issues that require unique solutions. But by failing to reasonably consider that option in light of the AHA's comments, the Board engaged in arbitrary and capricious action in violation of the Administrative Procedure Act.

## ARGUMENT

To avoid arbitrary and capricious regulation, the APA "requires that agency action be reasonable and reasonably explained." *Clarke v. Commodity Futures Trading Comm'n*, 74 F.4th 627, 641 (5th Cir. 2023) (citation omitted). Under this standard, "a regulation is arbitrary and capricious if the agency 'failed to consider an important aspect of the problem' . . . includ[ing], of course, . . . the costs and benefits associated with the regulation." *Mexican Gulf Fishing Co. v. U.S. Dep't of Comm.*, 60 F.4th 956, 973 (5th Cir. 2023) (quoting *Motor Veh. Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). And when an agency engages in notice-and-comment rulemaking, it must "respond to significant points and consider all relevant factors raised by the public comments." *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 449 (5th Cir. 2021) (cleaned up).

Here, the Board fell short of this standard by failing to meaningfully address the comments submitted by the American Hospital Association (as well as other commenters) during the notice-and-comment process. As explained below, the Final Rule imposes a unique burden on hospitals and creates unique challenges for the hospital field. The AHA detailed these concerns at length in its comment letter, but the Board did not appropriately address them. Among other things, the Final Rule (1) relied on a flawed interpretation of the NLRA; (2) completely failed to address the serious consequences that the Board's new test would have in light of other interrelated federal health care laws; (3) sharply departed from longstanding regulatory history recognizing that the health care field should not be subject to one-size-fits-all labor rules; and (4) offered false consolidation that hospitals may not be subject to the Board's novel rule, when in fact the rule appears to unyieldingly dictate otherwise.  All of this—and more—was arbitrary and capricious. *See* Complaint, Dkt. 1, ¶¶ 57, 58(e).

**I. The Final Rule Imposes Significant and Disproportionate Harm on Hospitals.**

In its comment letter, the AHA explained four serious problems with the NLRB's newly expanded "joint employer" test. All of these problems remain just as serious today, yet the Board failed to seriously consider them in the rulemaking process, much less alter the Final Rule in a way that would ameliorate them.

*First*, in the wake of the Covid-19 pandemic, many hospitals are financially struggling and heavily reliant on outside contractors to provide a wide variety of critical services. But the Final Rule threatens to impose massive new costs and regulatory complexity by reclassifying hospitals as the "joint employers" of most, if not all, of these workers.

*Second*, to operate responsibly, hospitals must adopt various health and safety rules that apply to everyone who works in the hospital environment—including outside contractors. But the Final Rule treats these prudent safety rules as conclusive evidence that hospitals are the "joint employers" of outside contract workers, thus making it virtually impossible to rely on contract workers without having them deemed "joint employees."

*Third*, by dramatically changing the classification of hospital workers, the Final Rule interferes with a host of carefully calibrated federal funding schemes and formulas that apply to hospitals that accept Medicare, Medicaid, and other federal funding. The Board was required to consider the resulting costs and complexity, but it did not.  The Board completely ignored these reasonable concerns.

*Fourth*, the Final Rule's one-size-fits-all approach to the joint-employer inquiry conflicts with the Board's historical recognition that the unique labor issues in the health care field require tailored regulatory solutions.  Traditionally, the Board has recognized this dynamic by allowing flexible labor solutions for hospitals. But not this time.

**A. The Final Rule Harms Hospitals Due to their Necessary Reliance on Contract Labor.**

Hospitals are in the midst of a years-long financial crisis, facing spiraling cost increases and lagging revenue. As has been well-documented, the Covid-19 pandemic devastated hospital revenues. *See* Am. Hosp. Ass'n, *Hospital and Health Systems Face Unprecedented Financial Pressures Due to COVID-19* at 1 (May 2020), *available at* https://tinyurl.com/4axprn3c. Even as the pandemic came to an official end, most hospitals ended the calendar year 2022 with an operating loss. *See* Am. Hosp. Ass'n, *The Financial Stability of America's Hospitals and Health Systems Is at Risk as the Costs of Caring Continue to Rise* ("*Costs of Caring*") at 2 (Apr. 2023), *available at* https://tinyurl.com/3zdehhzz. These financial struggles are impacting access to care. For example, more than 140 rural hospitals have been forced to close over the last 13 years. *Costs of Caring* at 2.

Labor costs are a driving force in these financial difficulties. Lack of staff before, during, and after the pandemic increased competition for workers, which has driven labor costs higher. One analysis predicts a national shortage of over 500,000 registered nurses and 100,000 physicians by 2030. *See* Am. Consultants, *Navigating Major Staffing Shortages in Healthcare* (June 28, 2019), *available at* https://tinyurl.com/mrykfavx. In the face of these labor shortages, hospitals have been forced to rely on contract labor and staffing agencies. *See* Syntellis & Am. Hosp. Ass'n, *Hospital Vitals: Financial and Operational Trends: Workforce Pressures Take Their Toll in 2022*, at 3 (Feb. 2023), *available at* https://tinyurl.com/27f9tbwj. As a result, labor expenses have sky-rocketed.  Hospitals have "had to use more contract labor while also paying exponentially more for the contract labor they used," leading to a more than *250% increase* in contract labor costs over the last three years alone. *Id.*

In light of these facts, and as the AHA's comment letter explained, the health care field will suffer unique and disproportionate harms from the Board's adoption of an overbroad definition of joint employment. *See* Am. Hosp. Ass'n, *Comments on the NLRB's Notice of Proposed Rulemaking Re: the Standard for Determining Joint Employer Status* ("Comment Letter"), at 2-3 (Nov. 2023), *available at* https://tinyurl.com/7khjh9sr. By dramatically broadening the category of joint employment, the Final Rule makes it more likely that outside contractors will be considered hospital "employees" with whom hospitals must bargain. Struggling hospitals will thus be dragged into unwieldy multi-lateral negotiations with many different contractors and those contractors' employees, imposing massive complexity and regulatory compliance costs, as well as creating labor friction and potentially jeopardizing the contracting relationships. Put simply, the Final Rule will divert scarce hospital resources towards compliance and away from helping patients.

**B. The Final Rule Punishes Hospitals for Responsible Health and Safety Measures.**

As a matter of both law and professional responsibility, hospitals have a duty to maintain robust health and safety policies that protect their patients, visitors, and workers (including outside contractors) against the spread of disease and other harms. Under the Final Rule, however, hospitals will be penalized for complying with the law and maintaining such beneficial policies. According to the Final Rule, a hospital will be deemed the "joint employer" of any worker, even one who is employed by an outside contractor, if the hospital has direct or indirect control (regardless of whether that control is ever exercised) over that worker's "[w]orking conditions related to the safety and health of employees." 29 C.F.R. § 103.40(d)(7).

Under this provision, hospitals could be deemed the "joint employers" of almost every outside contract worker who performs any work in the hospital setting. The reason is simple: Given the nature of their operations, hospitals cannot operate unless they implement policies that are

"related to" the "safety and health" of everyone in the building. There are extensive laws and regulations that require hospitals to develop and maintain many different health and safety rules. And even aside from what is strictly required by law or regulation, hospitals have an ethical duty to maintain optimal health and safety policies on their premises.

To take just one example of regulatory requirements that affect many contract workers in hospitals, federal law requires that "[a]ll licensed nurses who provide services in the hospital" must "adhere to the policies and procedures of the hospitals," and the head of nursing at a hospital "must provide for the adequate supervision and evaluation of the clinical activities of all nursing personnel" working in the hospital. 42 C.F.R. § 482.23(b)(6). That supervision is extremely broad: hospital governing bodies "must ensure that the services performed under a contract are provided in a safe and effective manner." *Id.* § 482.12(e)(1). Hospitals therefore need to control to some extent "[w]orking conditions related to the safety and health" of contract nurses and those nurses' "manner, means, and methods of the performance of duties" to comply with these legal requirements. *See* 29 C.F.R. § 103.40(d).

Nor are such federal requirements limited to nursing. Hospitals also must "develop and maintain a comprehensive emergency preparedness program" that meets certain non-exhaustive requirements and develop "strategies for addressing emergency events." 42 C.F.R. § 482.15(a)(2). They are also required to maintain "facilities, supplies, and equipment . . . to ensure an acceptable level of safety and quality." *Id*. § 482.41(d)(2). And the list goes on and on.

As a result of regulatory requirements like these that inherently affect working conditions related to safety and health, it appears that hospitals have essentially no way to avoid becoming "joint employers" of all who work on their premises. For hospitals, then, it is a false promise for the Board to say that the Final Rule "permits business entities to evaluate and control their potential

8

status as joint employers, ex ante, based on their freely chosen contractual arrangements." Final Rule, 88 Fed. Reg. 73946, 73961 (Oct. 27, 2023). In fact, given these and other federal regulations, hospitals and health systems will have no ostensible ability to structure their relationships to avoid the sweep of the Final Rule.

In its commentary accompanying the Final Rule, the Board blithely dismissed this problem by asserting that "contractual terms that do nothing more than incorporate regulatory requirements, without otherwise reserving authority to control or exercising power to control the performance of work" will not be considered evidence of joint-employer status. *Id.* at 73965–66. But there are two serious problems with this assertion. First, it has no foundation in the actual regulatory text, which assigns joint-employer status to all entities that possess authority to directly or indirectly control "working conditions related to [worker] safety and health," with no exception for hospitals that *have no choice* due to regulatory requirements. 29 C.F.R. § 103.40(d)(7).

Second, even if a "regulatory compliance" exception could somehow be read into the regulations, it still would offer little comfort for hospitals because they have professional and ethical obligations to protect the health and safety of workers beyond their strict legal obligations. In the Final Rule, the Board explained that "[t]o the extent that an employer reserves further authority or discretion over health and safety matters" beyond "choosing among alternative methods of satisfying its legal obligation[s]," the authority to set safety and health rules can result in a finding of joint employment. 88 Fed. Reg. at 73966 n.175. That is likely dispositive for hospitals and health systems. Federal and state laws do not strictly dictate every aspect of what hospitals must do on all kinds of safety and health policies—from security access controls, to hand-washing rules, to hand-sanitizer availability, to glove and mask dispensing for visitors, to ventilation in rooms and hallways. Hospitals have both direct and indirect control over what

particularized "conditions" they want to adopt to comply with the complex backdrop of federal, state, and local laws.  And of course these "conditions" are "related to" the "safety and health" of virtually all contract workers in the building.

Under the Final Rule, then, virtually all contract employees who work at hospitals will still apparently be deemed part of a "joint employment" relationship with the hospital.  This cannot be squared with the commonsense principle that the "joint employer" test must not be so broad that it sweeps in everyone based on mere "quotidian aspects of common-law third-party contract relationships," thus collapsing the distinction between contractors and true employees. *Browning-Ferris Indus. of California, Inc. v. NLRB*, 911 F.3d 1195, 1220 (D.C. Cir. 2018).

## C. The Final Rule Has a Dramatic Impact on Federal Funding Schemes.

The Board also failed to consider how its radical expansion of the "joint employer" concept would affect other federal health care regulations. *See* Comment Letter at 3–5.  Needless to say, hospitals are heavily regulated.  "Almost every aspect of the field is overseen by one regulatory body or another, and sometimes by several." Robert I. Field, Why Is Health Care Regulation So Complex?, 33 Pharmacy & Therapeutics 607, 607 (Oct. 2006), https://tinyurl.com/26bfknp8. By one count, 130,000 pages of rules govern health care providers, with Medicare rules comprising over 100,000 of those pages. Victor E. Schwartz & Phil Goldberg, *Carrots and Sticks: Placing Rewards As Well As Punishment in Regulatory and Tort Law*, 51 Harv. J. Legis. 315, 350 (2014). By recategorizing hospitals' contract workers as employees, the Final Rule may cause significant changes in the outputs of these complex regulations.

As the AHA outlined in its comment letter, reclassifying hospital contractors as employers would have an impact on complicated aspects of government reimbursement formulae. It would change the Medicare wage index, "an important factor used in Medicare hospital payments to

10

account for geographic differences in hospital wage levels" governed by "strict rules that dictate which components [of hospital labor costs including contractor and employee costs] can be allocated for Medicare reimbursement purposes." Comment Letter at 4. The Final Rule also would affect the "labor-related share," a metric of "the proportion of hospital payments [that are] affected by wages" and related costs. *Id.* Small changes to this metric caused by transforming the labor-law status of health care contractors could have a large impact on Medicare reimbursements because it affects the base rate for reimbursement on which all other factors build. *Id.* Yet another metric that the Final Rule will affect is the "cost-to-charge ratio," a measure of how much each patient costs, which has an impact on, among other reimbursement inputs, the "Medicare Severity Diagnosis Related Groups weights," which are metrics that support Medicare inpatient reimbursement, especially for high-cost patients. *Id.* at 4–5.

The Board ignored these comments. Its response was simply that because it "discuss[ed]" the concerns of hospitals at a general level, it "disagree[d] with" the AHA's view that the Board has not sufficiently considered hospital-specific issues. 88 Fed. Reg. at 73960. But that "conclusory, unsupported" assertion gives no reason to believe that the Board actually considered these complicated issues, consulted with the other federal agencies about how the Board's rule would intersect with other federal health care laws, or contemplated tailoring its Rule in a way that could avoid the problem. *Wages & White Lion Invs., L.L.C. v. U.S. Food & Drug Admin.*, 16 F.4th 1130, 1137 (5th Cir. 2021). The Board's explanation is "thus wholly insufficient." *Id*. It was arbitrary and capricious for the Board to ignore these important considerations. *See id.* at 1138; *Texas v. Biden*, 10 F. 4th 538, 555–56 (5th Cir. 2021) ("The Government repeatedly argues that DHS's statement that it considered this or that factor is enough to avoid any arbitrary-and-

11

capricious problems.…   The law says otherwise. 'Stating that a factor was considered ... is not a substitute for considering it." (internal citation omitted)).

**D. The Final Rule Fails to Recognize the Unique Labor Issues Faced by Hospitals.**

The Board's Rule also is arbitrary and capricious because it inexplicably departs from the Board's longstanding practice of respecting the unique considerations that inform labor regulation in the health care field. As the AHA explained in its comment letter, the "NLRB has consistently tailored the application of Board law and precedent to hospitals." Comment Letter at 5. But here, the Board all but ignored that history and insisted on applying the Final Rule in a one-size-fits-all fashion, without adequately explaining why it rejected the AHA's request for a more specific regulatory solution that would be sensitive to the well-established needs of the hospital field.

In 1974, Congress amended the NLRA so that it covered non-profit hospitals. *See* Act of July 26, 1974, Pub. L. No. 93-360, 88 Stat. 395. But from the outset, Congress, the Board, and the courts all agreed that the unique characteristics of hospitals warranted different treatment than other employers in the context of labor relations. As the Board recognized early on, "the primary function of a hospital is patient care," and "carrying out that function" requires hospitals to follow certain labor practices that "may be justified" even if they would not be permissible for other employers. *St. John's Hospital & Sch. of Nursing*, 222 NLRB 1150 (1976); *see also, e.g.*, *NLRB v. Baptist Hosp., Inc.*, 442 U.S. 773, 783 n.12 (1979) (allowing special limits on union solicitation and distribution in hospitals due to "the importance of maintaining a peaceful and relaxed atmosphere" for patients). These decisions reflected Congress's judgment "that the needs of patients health care institutions required special consideration in the Act," *Laborers Int'l Union of N.A. Local Union No. 1057 v. NLRB*, 567 F.2d 1006, 1010 (D.C. Cir. 1977).

Following that principle, in 1989, the Board used its rulemaking authority to set standardized bargaining units in the health care field, in order to heed "Congress's admonition against proliferation of health care bargaining units." *Collective-Bargaining Units in the Health Care Industry*, 52 Fed. Reg. 25142, 25146 (July 2, 1987). Under those rules, which still exist today, the Board "limited the possible units in the various types of establishments to a reasonable, finite number of congenial groups displaying both a community of interests within themselves and a disparity of interests from other groups." *Id*.

In promulgating the Final Rule here, however, the Board decided to ignore that congressional "admonition" without any serious explanation. As explained above, the Final Rule provides that hospitals will be treated as the joint employers of—and thus required to bargain with—all contract staff with respect to "any term and condition of employment that [they] possess[] the authority to control," either directly or indirectly. 29 C.F.R. § 103.40(h)(1). This means that if a hospital has a bargaining unit of employee nurses, but also engages a staffing agency to provide "travel nurses" on a contract basis, the travel nurses will likely be deemed part of a "joint employment" relationship that could require bargaining with the hospital. The bargaining will have to be multi-lateral because it will need to include the contract nurses, the staffing agency, and the hospitals, all with unaligned interests. It will become even more complex because hospitals often use multiple outside staffing agencies even for one particular field of expertise such as nursing. And then this multiplicity of additional bargaining units will be repeated across all of the different work areas where hospitals use contract labor.

This is exactly the type of "proliferation" of bargaining units that the Board has said in previous rulemakings Congress directed the agency to avoid. 52 Fed. Reg. at 25146. Accordingly, the Board's contradiction of its previous regulatory approach on this score is a classic type of

13

arbitrary and capricious action. *E.g.*, *Univ. of Tex. M.D. Anderson Cancer Ctr. v. United States*, 985 F.3d 472, 479–80 (5th Cir. 2021) ("[A]gency action is arbitrary and capricious when it fails to supply a reasoned analysis for any departure from other agency decisions." (cleaned up)). And to make matters worse, the Board's response to the AHA's comments on this issue is wholly inadequate. In the Final Rule, the Board "acknowledge[d]" these concerns, 88 Fed. Reg. at 73960, but it did not reasonably explain why they did not justify a narrower approach that would avoid the proliferation of bargaining units. The Board relied on its blanket assertion that it had no power to devise a hospital-specific solution, *id.* at 73960, but, as discussed above, that is inconsistent with the Board's four-plus decades history of recognizing hospitals' unique status.

**II. The NLRA Did Not Require the Board to Ignore the AHA's Concerns.**

In response to the AHA's comments—and the mountain of other criticism of its proposed rule—the Board relied on one refrain over and over again: we have no choice. Instead of grappling with the comments and responding to them in a reasonable manner, the Board stated that the comments were "misdirected" because "the Act itself" supposedly "requires the Board to conform to" the sweeping "joint employer" test embodied in the Final Rule. 88 Fed. Reg. at 73978. In response to concerns about basing the joint-employment test on mere *indirect and unexercised* control, the Board asserted that it did not have "statutory authority to require a showing of actual exercise of direct and immediate control." *Id.* at 73951. Thus, the Board opined that the "concerns" expressed by the AHA and others did not "reflect considerations that, as a statutory matter, may determine the Board's choice" of policy. *Id.*

The Board is wrong for several reasons. For starters, it is highly implausible that the Final Rule's novel "joint employer" test is strictly *mandated* by the NLRA given that nobody thought it applied during the first nine decades after the statute was enacted. *See generally* Plaintiffs' Motion

for Summary Judgment, Dkt. 10, at 18–27. But even if the Final Rule did reflect a permissible reading of the common-law concept of joint employment, it certainly does not reflect the *only possible* reading. At the very least, the common law tradition embodied in the NLRA can reasonably be understood to allow a far narrower test for "joint employer" status, as laid out in the Board's own previous rule promulgated in 2020 on the same subject. *See* 29 C.F.R. § 103.40 (2022). Because that rule itself reflects a reasonable reading of the NLRA and the common-law background of joint employment, the Board certainly had the option of adhering to that rule, which means that it needed to consider all of the comments submitted by the AHA and others identifying problems that would result from the Board's new approach reflected in the 2023 Final Rule.

Although the Board "must color within the common-law lines identified by the judiciary," it is not required to regulate to the maximum extent allowed by the common law. *BFI*, 911 F.3d at 1208. As Member Kaplan explained in his dissent from the Final Rule, "while it is clear that the Board is precluded from adopting a more expansive joint-employer doctrine than the common law permits, it may adopt a narrower standard that promotes the Act's policies." 88 Fed. Reg. at 73988.

The Board has exercised this discretion in the past. For example, the Board specifically declined to exercise the statutory maximum of its authority because of concerns about protecting patient care in the hospital field. *See St. John's Hospital & Sch. of Nursing*, 222 NLRB 1150. Here, the Board could have relied on the same reasoning to avoid the hospital-specific problems identified in the AHA's comment letter. Its failure to even consider that option was arbitrary and capricious. *See also Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1910–11 (2020) (holding agency action arbitrary and capricious when it "did not appear to appreciate the full scope of [its] discretion"); *see generally* Compl. ¶¶ 55-58.

15

Moreover, as the Board majority itself acknowledged, it was under no obligation to proceed by rulemaking at all to create a universally applicable joint-employer definition; it could have proceeded case by case through adjudication, as it always did up until 2020. *See* 88 Fed. Reg. at 73956 (citing *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 294 (1974) ("[T]he choice between rulemaking and adjudication lies in the first instance within the Board's discretion.")). Or, if it was going to create a general rule, it could have refrained from applying that general rule to the hospital field, which it could have reserved for a later rulemaking that would take into account the unique labor issues and specific problems confronting hospitals. As the Supreme Court has recognized, "nothing prohibits federal agencies from moving in an incremental manner." *FCC v. Fox Television Stations, Inc*., 556 U.S. 502, 522 (2009); *Mobil Oil Exploration & Producing Se. Inc. v. United Distribution Cos.*, 498 U.S. 211, 231 (1991) ("[A]n agency need not solve every problem before it in the same proceeding.").

The Board cannot excuse its failure to respond to the AHA's comments by relying on its statement that "we would not choose to [adopt a narrower rule], as a matter of policy, in any case." 88 Fed. Reg. at 73951; *see also id.* at 73948 n.14 ("[T]he final rule reflects our policy choices, within the bounds of the common law . . . ."). Such a bare assertion does not even begin to fulfill the Board's duty to actually "respond to significant points and consider all relevant factors raised by the public comments." *Huawei*, 2 F.4th at 449 (cleaned up). "Nodding to concerns raised by commenters only to dismiss them in a conclusory manner is not a hallmark of reasoned decisionmaking." *Gresham v. Azar*, 950 F.3d 93, 103 (D.C. Cir. 2020). In short, the Board must *explain* its policy choices in light of the public comments presented. It cannot simply *assert* that the Final Rule reflects its policy discretion.

16

Nor can the Board rely on its conclusory assurance that the Final Rule will not create undue problems for hospitals because the Board in future adjudications will "consider all relevant evidence regarding the surrounding context." 88 Fed. Reg. at 73960 & n.100. That reassurance rings hollow given the Final Rule's text, which again provides that, if a hospital has the "authority to control . . . [w]orking conditions related to the safety and health of" a contractor's employees, even minimally, then that alone "is sufficient to establish status as a joint employer" and trigger bargaining requirements. 29 C.F.R. § 103.40(c), (d)(7), (e)(1). Having announced that unyielding test, the Board unlawfully failed to explain how considering "all relevant evidence regarding" might somehow avoid the sweeping reclassification of hospital contract workers as "employees."

Finally, the Board's cryptic explanation for why hospitals should not worry about this new test itself proves that the Final Rule is arbitrary and capricious. "[A]n agency's decision is arbitrary and capricious if illogical on its own terms." *Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1021 (5th Cir. 2019) (cleaned up). That is exactly the situation here. The Rule either does not mean what it says and it somehow would allow hospitals to avoid becoming joint employers of their contract staff, or else the Board's "all-relevant-evidence" response relies on a misunderstanding of how its own Rule will actually work. The result is the same either way: the Rule must be set aside. *See Chamber of Comm. of U.S. v. U.S. SEC*, 85 F.4th 760, at *11 (5th Cir. 2023) (rejecting a justification of agency policy because it was "internally contradictory").

In short, if the Board was not willing to provide more than cursory responses and false assurances to the AHA's concerns about the hospital field, it should not have swept up this massive and important part of the national economy into the Final Rule. Its decision to go ahead and do so without adequate explanation cannot be reconciled with the APA's requirement of reasoned and deliberative decision-making.

17

## CONCLUSION

For the reasons above, the Court should grant Plaintiffs' motion for summary judgment, set aside the Joint Employer Rule, and enjoin its application.


Date:   November 20, 2023                    Respectfully submitted,

<div style="margin-left: 40%;">

*/s/ Joanne Bush*
Joanne R. Bush
Texas Bar No. 24064983
JONES DAY
717 Texas, Suite 3300
Houston, Texas  77002
Phone:  (832) 239-3782
Fax:  (832) 239-3600
Email: jrbush@jonesday.com

Anthony J. Dick
D.C. Bar No. 1015585
William J. Strench
D.C. Bar No. 1781271
JONES DAY
51 Louisiana Ave. NW
Washington, DC 20001
Phone: (202) 879-3939
Fax: (202) 626-1700
Email: ajdick@jonesday.com

*Counsel to* Amicus Curiae
*American Hospital Association*

</div>

## **CERTIFICATE OF SERVICE**

The undersigned certifies that on November 20, 2023, the foregoing document was electronically submitted with the clerk of the court for the United States District Court, Eastern District of Texas, using the electronic case file system of the court.  I hereby certify that I have served all counsel of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).


*/s/ Joanne Bush*